IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRACY RANDLE and ALLISON TAYLOR, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SUNTRUST BANK, INC., and SUNTRUST INVESTMENT SERVICES, INC.,<br><br>Defendants. | Case: 1:18-cv-01525  Jury Demand<br>Assigned To : Kelly, Timothy J.<br>Assign. Date : 6/26/2018<br>Description: Employ. Discrim. (H Deck)<br><br>Jury Trial Requested |

**RECEIVED**

JUN 2 6 2018

**COMPLAINT**

Clerk, U.S. District and
Bankruptcy Courts

Plaintiffs Tracy Randle and Allison Taylor ("Plaintiffs"), appearing before the Court *pro se*[1] on behalf of themselves and all others similarly situated, hereby file this class action Complaint of race discrimination against Defendants SunTrust Bank, Inc. and SunTrust Investment Services, Inc. (collectively "Defendants "SunTrust," or "the Firm"), and in support state as follows:

## OVERVIEW

1. SunTrust is the twelfth largest bank in the United States, with over $200 billion in assets under management and a market capitalization of over $30 billion.[2] SunTrust employs approximately 1,500 Financial Advisors ("FAs") to provide financial advisory and brokerage services to its investors.

---

[1] Although Randle and Taylor file this Complaint *pro se*, Stowell & Friedman, Ltd. represents Randle and Taylor and drafted this Complaint on their behalf. No attorney at Stowell & Friedman Ltd. is currently licensed to practice law in the District Court for the District of Columbia; however they are in the process of gaining admission to the District Court for the District of Columbia.

[2] http://s2.q4cdn.com/438932305/files/doc_financials/2017/ar/2017-Annual-Report_FINAL.pdf

1

430648

2. SunTrust provides widely divergent compensation and opportunities to the Financial Advisors who service its clients, depending on their race. African Americans are underrepresented as SunTrust FAs and paid substantially less than their counterparts who are not African American. These racial disparities result from SunTrust's systematic, intentional race discrimination and from policies and practices that have an unlawful disparate impact on African Americans.

3. SunTrust maintains a racially biased corporate culture replete with harmful stereotypes regarding its African American employees and customers that infects its policies and decision-making, including by racial steering and race-matching of employees, territories, and clients. Plaintiffs, and the class they seek to represent in this lawsuit, challenge SunTrust's company-wide policies and practices that result in higher rates of attrition and lower pay for African Americans and that segregate the SunTrust workforce by race.

4. Plaintiffs file this lawsuit to hold SunTrust accountable for its unlawful treatment of African American FAs and to achieve meaningful reform. This lawsuit is brought by Plaintiffs on behalf of themselves and all other African American SunTrust Financial Advisors who work or worked as registered brokers and have been subjected to and harmed by its company-wide pattern or practice of race discrimination and discriminatory policies and practices. This action seeks class-wide injunctive relief to end SunTrust's entrenched race discrimination and make-whole relief for class members.

## JURISDICTION AND VENUE

5. Plaintiffs' claims arise under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

2

430648

6. Venue is proper in the District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b). Defendants are licensed to do business in this District, operate numerous bank branches throughout this District, and service clients who are residents of this District. Throughout her tenure at SunTrust, Randle worked for and was harmed by SunTrust in this District. The unlawful conduct alleged in this Complaint occurred in this District and across the United States.

**PARTIES**

7. SunTrust Bank, Inc. is a publicly-traded, super-regional financial services firm and a Fortune 500 corporation that is incorporated in Georgia and headquartered in Atlanta. SunTrust Investment Services, Inc. is a wholly owned and privately held subsidiary of SunTrust, incorporated in Virginia and registered with the Securities and Exchange Commission ("SEC") as a broker-dealer.

8. Plaintiff Tracy Randle ("Randle") is African American and was employed as a SunTrust FA covering branches in Maryland and in Washington, D.C. during her tenure from 1995 until she was constructively discharged in July 2016.[3] Throughout her employment at SunTrust, and pursuant to Defendants' pattern or practice of discrimination and company-wide discriminatory policies, SunTrust assigned Randle to less lucrative bank branches and territories and denied her resources, promotions, titles, teaming opportunities, and business opportunities, including lucrative client accounts, because of her race. SunTrust treated Randle worse than similarly situated SunTrust employees who are not African American, and Randle lost income and was otherwise harmed as a result of Defendants' unlawful conduct.

---

[3] Plaintiff Tracy Randle began her employment with Citizens Bank of Maryland in January 1995. In January 2000, SunTrust acquired Citizens Bank of Maryland and Randle continued her employment with SunTrust.

3

430648

9. Plaintiff Allison Taylor ("Taylor") is African American and was employed as a SunTrust FA in various branches in Virginia from January 2010 until she was constructively discharged in September 2016. Throughout her employment at SunTrust, and pursuant to Defendants' pattern and practice of discrimination and company-wide discriminatory policies, SunTrust assigned Taylor to less lucrative bank branches and territories and denied her resources, titles, promotions, teaming opportunities, and business opportunities, including lucrative client accounts, because of her race. SunTrust treated Taylor worse than similarly situated SunTrust employees who are not African American, and Taylor lost income and was otherwise harmed as a result of Defendants' unlawful conduct.

## FACTUAL ALLEGATIONS

10. SunTrust maintains a corporate culture replete with harmful racial stereotypes and biased views about the skills, abilities, and potential of African American employees and clients. SunTrust's racial bias is exemplified by its racial steering, racial redlining and other discriminatory practices against employees and customers of color, as illustrated in a number of recent lawsuits. SunTrust has paid millions of dollars to avoid litigating its discriminatory practices.

11. For example, in May 2012, SunTrust Mortgage, Inc., a wholly-owned subsidiary of SunTrust Bank, paid over $21 million to settle a lawsuit brought by the Department of Justice ("DOJ") alleging discriminatory mortgage practices in violation of the Fair Housing Act and Equal Credit Opportunity Act. *United States v. SunTrust Mortgage, Inc.*, 12-cv-0397 (E.D. Va. 2012). The DOJ sued SunTrust for charging more than 20,000 qualified African-American and Hispanic borrowers higher fees and interest rates, not based on borrower risk, but because of their race or national origin.

12. Defendants' racially biased culture infects personnel decisions and creates an environment where occupational segregation, disparate treatment, and harassment are pervasive and condoned. This is reflected by the complete lack of African Americans on SunTrust's Executive Council.[4]

13. SunTrust maintains strict, centralized control over its financial advisory and brokerage services business from its company headquarters, where an all-white team of senior executives designs and issues mandatory, company-wide policies and practices governing its Financial Advisor workforce. These include uniform, Firm-wide policies and practices that govern compensation, teaming, and the assignment of territory, resources, designations and business opportunities. These practices segregate its workforce, discriminate against African Americans, and have a disparate impact on African Americans that is not justified by business necessity.

14. SunTrust Financial Advisors advise and service SunTrust's customers in all eleven states and the District of Columbia where SunTrust has bank branch locations and are compensated pursuant to uniform, company-wide compensation plans. Due to the commission-based incentive system under which FAs are compensated at SunTrust, and the Firm's business practices regarding advancement, a level playing field and fair distribution of resources and business opportunities are essential.

15. Defendants' policies and practices, however, do not create an equal playing field for African Americans, but instead result in significant compensation and attrition disparities based on race.

---

[4] http://newsroom.suntrust.com/executive-bios

5

16. Most SunTrust FAs operate out of SunTrust's more than 1,400 community-based bank branch locations. SunTrust studies and ranks its bank branches and territories according to various metrics and demographic data, including client and community wealth, asset base, and other measures of opportunity in a given branch or territory. As a result of racial stereotypes, SunTrust disproportionately assigns African American FAs to less lucrative branches and territories, with fewer investable assets and less wealthy clients and potential clients. SunTrust also "race matches" and assigns African American FAs to branches with higher African American and minority populations. White FAs are assigned to wealthier, "whiter" territories with greater opportunities. The few African American FAs assigned to more affluent or Premier branches often have these branches taken away, or have their best accounts or opportunities targeted and taken away by non-African American FAs and management. These practices dramatically limit the compensation and advancement opportunities and increase attrition of African American FAs.

17. A significant portion of the business opportunities of bank-based FAs are derived from leads and support from licensed bankers working in the branches to which the FAs are assigned. African American FAs, however, are assigned branches with no or fewer licensed bankers. African American FAs are also often assigned to multiple, smaller branches, diluting their time and resources, and limiting the FAs' ability to form consistent, productive relationships with lead-generating bankers and clients. As a result, and by the SunTrust's design, African American FAs have less lucrative accounts and territories than their non-African American colleagues.

18. In or around 2014, SunTrust began ranking its branches based on the demographics and average income of the community in which they were located, among other

430648

criteria. Each branch was placed in Tiers I - III, with Tier I being the most lucrative and Tier III being the least lucrative. The most lucrative branches were then designated as "Premier" locations, and were assigned "Premier Bankers" and a "Premier Advisor." Among other advantages, the prestigious Premier Advisor designation means that the FA receives a dedicated private banker to help that FA prospect for clients with investable assets, while being assigned to a branch that SunTrust has determined has the wealthiest customer base and therefore the best business prospects for FAs seeking investments. Premier Advisors have substantially greater business and income opportunities.

19. African American FAs are disproportionately excluded from becoming Premier Advisors and from Premier bank branch assignments and dedicated sales support, based on discriminatory practices and criteria. Premier bank branch locations are largely in affluent areas and are disproportionately absent from predominantly African American communities, to which African American FAs are steered by SunTrust. The assignment and selection of Premier Advisors segregates African American FAs and alters the terms and conditions of their employment.

20. Similarly, Suntrust has created a lucrative, and segregated, "Wealth Advisor" designation. Suntrust provides Wealth Advisor FAs with teaming opportunities, enhanced compensation payouts, and exclusive access and referrals to high net worth clients and the firm's largest and most lucrative accounts. Indeed, Suntrust prohibits non-Wealth Advisor FAs from servicing accounts over a certain threshold, and mandating that these high net worth opportunities be referred to Wealth Advisors. African American FAs are almost entirely excluded from the Wealth Advisor designation and the accompanying compensation and advancement opportunities.

7

21. In sum, the Firm's policies and practices discriminate against African American FAs by assigning lucrative branches, resources, titles, teaming and business opportunities to FAs based on their race, and by designating FAs as Wealth Advisors, a segregated club from which African Americans are largely excluded. In many respects, SunTrust relies on factors that have a disparate impact on African Americans and disproportionately benefit white FAs, including "by prescribing criteria that favor the already successful – those who may owe their success to having been invited to join a successful or promising team." *McReynolds v. Merrill Lynch*, 672 F.3d 482, 490 (7th Cir. 2012).

22. African Americans are further harmed by the SunTrust's compensation policies and practices, which intentionally discriminate against African American FAs in a number of ways, including by knowingly relying on factors that disadvantage African Americans. These include the types and amounts of assets, products, and transactions that generate commissions, and the corresponding commission rates, among other features. These compensation practices do not reward productivity, but instead serve the purpose of diminishing the compensation of African American FAs, barring them from lucrative SunTrust incentive programs, and limiting their growth potential and pay.

23. FAs are compensated on commissions earned from transactions performed for the benefit of clients. Investors in the less-affluent communities to which SunTrust assigns African American FAs tend to have a higher proportion of low-risk investments such as fixed annuities, which do not generate commissions for the FA after the initial account is established. Further, fixed annuities are paid out to clients on a monthly basis and result in net negative asset flow to FAs, which SunTrust then uses to penalize FAs by dramatically limiting their commission

430648

payout rate under the "alternate grid." SunTrust's alternate grid discriminated against African American FAs and was instituted in order to force African American FAs to leave SunTrust.

24. SunTrust's compensation practices also harm its lower-income and African American clients, whose accounts are less valued by the Firm. SunTrust incentivizes FAs to avoid advising and servicing lower-income customers' investment accounts by refusing to compensate FAs for the asset types and asset levels often held by these poorer, disproportionately minority, clients.

25. In sum, Defendants have and are engaged in an ongoing company-wide pattern and practice of race discrimination and knowingly employ company-wide policies and practices that have a disparate impact on African Americans. Defendants' systemic discrimination against African Americans includes, but is not limited to, the following practices that are both intentionally discriminatory and have an unlawful disparate impact on African Americans:

    a. Employing firm-wide policies and practices regarding the assignment, distribution and transfer of client accounts, leads, referrals, and other business opportunities that disproportionately steer these lucrative business opportunities to Financial Advisors who are not African American;

    b. Employing firm-wide policies and practices that assign African Americans to less lucrative territories and branches, including by open race matching and racial steering, and result in a segregated workforce and substantial racial disparities in earnings and attrition rates;

    c. Employing firm-wide policies and practices that deny African Americans teaming opportunities, resources, and support on account of race, including licensed banking, Premier and Wealth Advisor designation, management support, and other resources;

    d. Employing firm-wide policies and practices regarding the assignment of jobs, titles, and designations, including but not limited to the Premier Advisor and Wealth Advisor designation, that disproportionately exclude African Americans;

9

e. Employing firm-wide policies and practices regarding assignment to the Firm's high net worth FA designations and positions, including but not limited to Premier Advisor and Wealth Advisor, that harm and exclude African Americans;

f. Employing firm-wide, discriminatory policies and practices regarding job assignment, promotion, and management assessment and selection that harm and exclude African Americans; and

g. Employing firm-wide compensation policies and practices that disproportionately disadvantage African Americans.

26. The intentional and disparate impact described above is ongoing and constitutes a continuing violation of the civil rights laws.

27. The racially discriminatory policies and practices at Defendants are uniform and company-wide in scope. Class members relying on Plaintiffs to protect their rights work or worked at SunTrust bank branch locations across the country and were harmed by these same policies and practices.

**Plaintiffs Were Injured By Defendants' Unlawful Conduct**

28. Plaintiffs, like other African American FAs at SunTrust, were subjected to and harmed by Defendants' pattern or practice of discrimination and unlawful policies and practices. Among other things, Plaintiffs were assigned to less lucrative territories, denied licensed banker and other necessary support, and denied client accounts, leads, titles, referrals and other business opportunities because of their race. Plaintiffs lost substantial income due to Defendants' discriminatory compensation practices.

29. Plaintiff Tracy Randle joined Citizens Bank of Maryland in 1995 and worked there until SunTrust purchased Citizens Bank in January 2000. Randle continued her employment with SunTrust after the sale. Randle worked hard and successfully developed clients at the bank branches in her territory. Within the first three years of her employment with

430648

Defendants, Randle was producing at levels which earned her white colleagues business opportunities and sales support, including the support of sales assistants, but Complainant was denied such support and opportunities, even after repeated requests.

30. Randle was consistently assigned a number of bank branches in poor communities in the Maryland area. Customers in these areas often had little to no investible assets. On several occasions, Randle requested assignment to more lucrative bank branches of the types to which white FAs with similar or less experience and success were routinely assigned. Randle's requests were either ignored or denied.

31. During most of her career at SunTrust, and because of her race, Randle was denied assignment to a Premier bank branch. Despite being repeatedly told that there were no Premier branches available, Randle witnessed white FAs assigned or relocated to Premier branch locations. Just prior to her departure, SunTrust gave Randle access to what it called a Premier bank, but it lacked opportunity and was "Premier" in name only.

32. Throughout her tenure, SunTrust denied Randle business opportunities and support, including client accounts, leads, referrals and licensed banking and other sales support. Despite her over 20 years of servicing high net worth clients, SunTrust refused to designate Randle a Wealth Advisor, denying her the ability to team with and garner lucrative referrals. Because of SunTrust's hostility to African American clients and FAs and discriminatory practices, Randle's earnings were substantially diminished, as were her advancement opportunities. Randle was further harmed by the Firm's compensation practices, which were intended to punish and drive her and other African American FAs from the Firm.

33. Plaintiff Allison Taylor joined SunTrust in January 2010. Consistent with SunTrust's policy and practice of assigning African American FAs to multiple, smaller branches,

11

diluting their time and resources, and limiting the FAs' ability to form consistent, productive relationships with lead-generating bankers and clients, Taylor was assigned to cover six branch locations. SunTrust assigned Taylor to less lucrative branches and territories, including branches notorious for their poor investment quality. Taylor repeatedly requested more lucrative branches and to be reassigned.

34. In or around 2011, after repeated requests for a more lucrative branch, Taylor was permitted to cover a branch in Kingstown, Virginia. She performed very well, and over the course of nine months increased production at the Kingstown branch by approximately 150%. Despite her hard work and success, SunTrust took the Kingstown branch from Taylor and assigned it to a white FA. Taylor was not originally assigned any replacement branch. She was later offered to cover the Woodridge branch, located in a majority-minority community with very little investment opportunity.

35. When Taylor was finally assigned a "Premier" branch, the opportunities were not comparable to the Premier branches Suntrust assigned to white FAs. Indeed, Taylor's earnings decreased during her coverage of this branch.

36. Throughout her tenure, white SunTrust FAs contacted Taylor's clients and tried to persuade them to leave Taylor and place their money with the white FAs. Taylor lost several clients to her white colleagues who, in violation of SunTrust policy, contacted her clients without her permission. It is SunTrust's policy and practice to permit white FAs to poach clients from African American FAs, while penalizing African American FAs who mistakenly attempt to contact clients or prospects of white FAs.

37. Taylor lodged complaints to management regarding her treatment, to no avail. To the contrary, management harassed and disparaged her, and her differential treatment continued.

430648

38. Consistent with SunTrust's policy and practice, SunTrust denied Taylor business opportunities, resources, sales support, and including client account transfers, leads, referrals and licensed banking support, making it impossible for Taylor to succeed. Ultimately, Taylor was constructively discharged in September 2016 because of SunTrust's discriminatory policies that made it impossible for her to succeed as a FA at SunTrust.

39. All Plaintiffs lost wages and other benefits, suffered emotional distress and other nonpecuniary losses, and suffered irreparable harm to their careers as a result of SunTrust's unlawful conduct and discriminatory practices. Defendants' actions have caused and continue to cause Plaintiffs substantial losses in earnings, management opportunities and other employment benefits, in an amount to be determined by a jury.

## CLASS ALLEGATIONS

40. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of African Americans who worked for SunTrust as FAs and who were subjected to discrimination by SunTrust due to their race. All requirements of class certification are met by the proposed class.

41. The class of African American employees and former employees is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1).

42. There are questions of law and fact common to the class, and those questions can and should be resolved in a single proceeding that furthers this litigation. Fed. R. Civ. P. 23(a)(2).

43. The claims alleged by Plaintiffs are typical of the claims of the class members. Fed. R. Civ. P. 23(a)(3).

430648

44. Plaintiffs will fairly and adequately represent and protect the interests of the class. Fed. R. Civ. P. 23(a)(4).

45. The proposed class also meets the requirements for certification under Rule 23(b)(2) and/or Rule 23(b)(3). The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

46. The issues of determining liability and equitable relief, among other issues, are also appropriate for certification under Rule 23(c)(4), as are other common issues.

## COUNT I

### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

47. Plaintiffs, on behalf of themselves and those similarly situated, reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of Count 1 of this Complaint.

48. Section 1977 of the Revised Statutes, 42 U.S.C. § 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, and conditions of the contractual relationship.

49. SunTrust maintains a nationwide set of uniform, discriminatory employment practices and engaged in a pattern or practice of systemic race discrimination against African Americans that constitutes illegal intentional racial discrimination in violation of 42 U.S.C. § 1981.

430648

50. Through the conduct alleged herein, SunTrust denied Plaintiffs and other African American FAs business opportunities (including but not limited to client accounts, leads, and referrals); assignment of favorable branch office locations; resources valuable to their career and business; and sales, administrative and management support because of their race and based on racial stereotypes. Defendants also discriminated against Plaintiffs and all other similarly situated African American FAs in compensation and in other terms and conditions of their employment.

51. Plaintiffs and all those similarly situated were subjected to and harmed by SunTrust's systemic and individual discrimination.

52. On behalf of themselves and the class they seek to represent, Plaintiffs request the relief set forth below.

## COUNT II

### RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

53. Plaintiffs, on behalf of themselves and those similarly situated, reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of Count I of this Complaint.

54. Plaintiffs allege that they engaged in protected activity by complaining of their unlawful treatment.

55. Plaintiffs allege that they suffered retaliation and harm because of their protected activity, in violation of 42 U.S.C. § 1981.

## COUNT III

### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 2000e *et seq.*

430648

56. Plaintiff Randle, on behalf of herself and those similarly situated, reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of Count III of this Complaint.

57. Plaintiff Randle filed a charge of race discrimination with the Equal Employment Opportunity Commission and received Notice of Right to Sue. Defendants were placed on notice of the representative allegations contained in this Complaint through Plaintiff Randle's EEOC charge. Plaintiff Randle brings this suit within 90 days of receipt of such notice.

58. Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of race, or to limit, segregate, or classify its employees or applicants for employment in any way which deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his or her status as an employee on the basis of race.

59. By their conduct as alleged herein, Defendants unlawfully discriminated against Plaintiff Randle and those similarly situated in violation of Title VII, under both disparate treatment and disparate impact theories of liability.

## COUNT IV

### RETALIATION IN VIOLATION OF 42 U.S.C. § 2000e *et seq.*

60. Plaintiff Randle, on behalf of herself and those similarly situated, reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of Count IV of this Complaint.

61. Plaintiff Randle filed a charge of retaliation with the Equal Employment Opportunity Commission and received Notice Right to Sue. Defendants were placed on notice of

430648

the representative allegations contained in this Complaint through the Plaintiff Randle's EEOC charge. Plaintiff Randle brings this suit within 90 days of receipt of such notice.

62. Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer to retaliate against an employee based on the employee's opposition to employment discrimination or complaint of discrimination.

63. Plaintiff Randle alleges that she engaged in protected activity by complaining of her unlawful treatment.

64. Plaintiff Randle alleges that she suffered retaliation and harm because of her protected activity, in violation of 42 U.S.C. § 2000e-3(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court find in favor of them and the class they seek to represent and against Defendants as follows:

a. Certify this case as a class action;

b. Designate Plaintiffs as Class Representatives and designate Plaintiffs' counsel of record as Class Counsel;

c. Declare the SunTrust's acts, conduct, policies and practices are unlawful and violate 42 U.S.C. § 1981 and 42 U.S.C. § 2000e et seq.;

d. Declare that SunTrust engages in a pattern and practice of racial discrimination against African Americans and employs policies and practices that have an unlawful disparate impact on African Americans;

e. Order Plaintiffs and all others similarly situated reinstated to their appropriate positions, promotions, and seniority, and otherwise make Plaintiffs whole;

430648

f.  Award Plaintiffs and all others similarly situated the value of all compensation and benefits lost and that they will lose in the future as a result of SunTrust's unlawful conduct;

g.  Award Plaintiffs and all other all others similarly situated compensatory and punitive damages;

h.  Award Plaintiffs and all others similarly situated prejudgment interest and attorneys'' fees, costs, and disbursements, as provided by law;

i.  Award Plaintiffs and all others similarly situated such other make whole equitable, injunctive, and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiffs; and

j.  Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.

430648

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a jury trial as provided for by Rule 38(a) of the Federal Rules of Civil Procedure.

Respectfully submitted on behalf of Plaintiffs and those similarly situated,

*/s/ Tracy Randle*
TRACY RANDLE

Tracy Randle
4307 Broken Arrow Ct.
Clinton, Maryland 20735

*/s/ Allison Taylor*

Allison Taylor
6264 Rose Hill Drive Apt 1-B
Alexandria, Virginia 22310