# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TRACY RANDLE, ALLISON TAYLOR, ARTHUR BOYD, and TAHIR JOHNSON, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>SUNTRUST BANKS, INC., SUNTRUST INVESTMENT SERVICES, INC., TRUIST FINANCIAL CORPORATION, and TRUIST INVESTMENT SERVICES, INC.,<br><br>                    Defendants. | Civil Action No.: 1:18-cv-01525-TJK<br><br>**Hon. Judge Timothy Kelly** |

## PLAINTIFFS' UNOPPOSED MOTION FOR CLASS CERTIFICATION AND FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Linda D. Friedman
Suzanne E. Bish
George S. Robot
STOWELL & FRIEDMAN, LTD.
303 W. Madison St., Suite 2600
Chicago, IL 60606
(312) 431-0888
lfriedman@sfltd.com
sbish@sfltd.com
grobot@sfltd.com

*Attorneys for Plaintiffs, on behalf of themselves*
*and all others similarly situated*

January 12, 2024

## TABLE OF CONTENTS

I.     FACTUAL BACKGROUND AND SUMMARY OF SETTLEMENT TERMS ..............2

   A.  The Litigation..................................................................................................2

   B.  The Court Preliminarily Approved the Settlement ..........................................5

   C.  The Settlement Delivers Exceptional Programmatic and Monetary Relief.......................5

      1.  Programmatic Relief ..............................................................................5

      2.  FA Advisory Council..............................................................................6

      3.  Efforts to Increase African American FA Representation and Retention....................7

      4.  Branch Assignments and Account Distributions ....................................7

   D.  The Settlement Fund and Claims Resolution Process ......................................8

II.    The Class Response to the Settlement Has Been Overwhelmingly Positive.....................9

ARGUMENT ......................................................................................................................9

I.     The Settlement Is Fair, Reasonable, and Adequate and Should Be Approved...................9

   A.  Class Representatives and Class Counsel Have Adequately Represented the Class.........10

   B.  The Settlement Was Vigorously Negotiated at Arm's Length .........................12

   C.  The Relief Provided for the Class Is More Than Adequate..............................13

      1.  The Settlement Will Deliver Outstanding Relief to the Class and Should Be Approved ....................................................................15

      2.  Absent Settlement, Class Members Would Face Additional Costs, Risks, and Delay ....................................................................17

      3.  The Claims Resolution Process Will Effectively Allocate Relief to the Class .........18

      4.  The Requested Attorneys' Fees Are Reasonable and Should Not Bear on the Adequacy of the Settlement ......................................19

      5.  The Settlement Is Adequate in Light of the Stage of the Litigation Proceedings ......20

      6.  The Positive Reaction of the Class and the Opinion of Experienced Class Counsel Support the Settlement's Adequacy ......................21

   D.  The Claims Resolution Process Treats Class Members Equitably ...................22

II.    The Settlement Class Meets Rule 23 and Should Be Certified .......................22

   A.  The Class Meets All Requirements of Rule 23(a) ..........................................23

   B.  The Class Meets the Requirements of Rule 23(b)(2) and 23(b)(3) ..................25

III.   The Notice Provided to the Class Satisfies Due Process ................................26

CONCLUSION......................................................................................................27

## **TABLE OF AUTHORITIES**

**Cases**

*Alvarez v. Keystone Plus Constr. Corp.*, 303 F.R.D. 152 (D.D.C. 2014) .............................. passim

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ................................................. 26

*Chi. Tchrs. Union v. Bd. of Educ. of City of Chi.*, 797 F.3d 426 (7th Cir. 2015) ........................ 26

*Cohen v. Chilcott*, 522 F. Supp. 2d 105 (D.D.C. 2007) ................................................. 20

*Coleman ex rel. Bunn v. District of Columbia*, 306 F.R.D. 68 (D.D.C. 2015) ............................. 23

*Cook v. Billington*, No. 82-cv-0400, 1988 WL 142376 (D.D.C. Dec. 13, 1988) ........................ 24

*D.L. v. District of Columbia*, 860 F.3d 713 (D.C. Cir. 2017) ...................................... 25

*Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147 (1982) .......................................... 24

*Howard v. Liquidity Servs. Inc.*, No. 14-cv-1183 (BAH), 2018 WL 4853898 .......... 10, 18, 20, 22

*Hubbard v. Donahoe*, 958 F. Supp. 2d 116 (D.D.C. 2013) ........................................... 20

*In re APA Assessment Fee Litig.*, 311 F.R.D. 8 (D.D.C. 2015) ........................................ 26

*In re District of Columbia*, 792 F.3d 96 (D.C. Cir. 2015) ........................................... 24

*In re Domestic Airline Travel Antitrust Litig.*, 322 F. Supp. 3d 64 (D.D.C. 2018) ..................... 26

*In re Lorazepam & Clorazepate Antitrust Litig.*, No. 99-276, 2003 WL 22037741 (D.D.C. June 16, 2003) ........................................................................................ 18

*In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d 100 (D.D.C. 2004) ................................. 9, 12, 20

*Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685 (N.D. Ga. 2001) ................................... 15

*J.D. v. Azar*, 925 F.3d 1291 (D.C. Cir. 2019) ..................................................... 23

*Kosen v. Am. Express Fin. Advisors, Inc.*, No. 02-cv-0082 (D.D.C. June 16, 2002) ................. 20

*Little v. Washington Metro. Area Transit Auth.*, 313 F. Supp. 3d 27 (D.D.C. 2018) ............ 14, 15

*Meyer v. Panera Bread Co.*, No. 17-cv-2565, 2019 WL 11271381 (D.D.C. Mar. 6, 2019) ........ 19

*Meyer v. Panera, LLC*, No. 17-cv-2565, 2019 WL 11271378 (D.D.C. Mar. 29, 2019) ............. 19

*Moore v. Napolitano*, 926 F. Supp. 2d 8 (D.D.C. 2013) ............................................ 25

*Osher v. SCA Realty I, Inc.*, 945 F. Supp. 298 (D.D.C. 1996) ...................................... 10

*Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37 (D.D.C. 2010) .................................. 15

*Rogers v. Lumina Solar, Inc.*, No. 18-cv-2128, 2020 WL 3402360 (D.D.C. June 19, 2020) 11, 21

*Stephens v. Farmers Rest. Grp.,* No. 17-cv-1087, 2019 WL 2550674 ................................ 14

*Thorpe v. District of Columbia*, 303 F.R.D. 120 (D.D.C. 2014) ................................... 24

*True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052 (C.D. Cal. 2010) ............................. 20

*Vista Healthplan, Inc. v. Warner Holdings Co. III*, 246 F.R.D. 349 (D.D.C. 2007) ................. 15

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ........................... 26

**Statutes**

28 U.S.C. § 1715(d) ............................................................................. 27

**Rules**

Fed. R. Civ. P 23(a)(2) .......................................................................... 24

## TABLE OF AUTHORITIES
### (con't)

**Page**

Fed. R. Civ. P. 23 .................................................................................................. 26
Fed. R. Civ. P. 23(b)(2) ......................................................................................... 26
Fed. R. Civ. P. 23(b)(3) ......................................................................................... 26
Fed. R. Civ. P. 23(e)(1) ......................................................................................... 26
Fed. R. Civ. P. 23(e)(2) .................................................................................... 10, 14
Fed. R. Civ. P. 23(e)(2)(A) .................................................................................... 10
Fed. R. Civ. P. 23(e)(2)(B) .................................................................................... 12
Fed. R. Civ. P. 23(e)(2)(C) .................................................................................... 14
Fed. R. Civ. P. 23(e)(3) .......................................................................................... 14

Plaintiffs and Class Representatives Tracy Randle, Allison Taylor, Arthur Boyd, and Tahir Johnson, and Class Counsel Stowell & Friedman, Ltd., are proud to submit to this Court for final approval the class settlement (Dkt. 56-1) reached in this important case, which provides a $14 million settlement fund and meaningful programmatic relief to increase opportunities for a class of African American and Black Financial Advisors ("African American FAs") who were employed by SunTrust Banks, Inc. and SunTrust Investment Services, Inc. ("SunTrust"), which following a merger during this litigation became Truist Financial Corporation and Truist Investment Services, Inc. ("Truist") (collectively with the SunTrust entities "Defendants" or "the Firm").

This Settlement is the product of over six years  of litigation and negotiations, including a hard-fought motion to dismiss, extensive exchange of information and analysis of the underlying facts and law, and exhaustive and hard-fought negotiations over a two-year period overseen by an experienced, independent mediator. The Settlement's $14 million Settlement Fund is substantial in view of the risks of continued litigation and by comparison to similar settlements.

On November 27, 2023, this Court provisionally certified the class and preliminarily approved the Settlement, finding that the proposed Settlement was "fair, reasonable, adequate, and the result of extensive, arm's length negotiation between experienced counsel and Parties" and therefore "within the range of preliminary settlement approval such that notice to the Class is appropriate." (Dkt. 59 at 3.) Since preliminary approval, and after a successful notice campaign, the response of the Class has been overwhelmingly positive—**zero** Class Members objected to or opted out of the Settlement. The Class's positive reaction offers further evidence that Class

Counsel[1] and the Class Representatives reached an exceptional result for Class Members, which they are proud to recommend to this Court.

As this Court previously ruled at preliminary approval, the Settlement satisfies the criteria for approval set forth in Federal Rule of Civil Procedure 23(e)—it is fair, reasonable, and adequate—and for certification under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3). Accordingly, Plaintiffs respectfully move the Court for approval of the Settlement and certification of the class.

## I.    FACTUAL BACKGROUND AND SUMMARY OF SETTLEMENT TERMS

### A.  The Litigation

As alleged in the Second Amended Complaint, all four of the Class Representatives had similar experiences at SunTrust. Plaintiff and Class Representative Tracy Randle joined SunTrust with years of experience and success in the financial-services industry. (Dkt. 38 ¶ 32.) However, she alleges she was denied by SunTrust lucrative bank branch assignments and instead assigned to branches with fewer opportunities and was denied client accounts and other business opportunities and resources because of her race and consistent with the experiences of other African American SunTrust advisors. (*Id.*)

As a result and seeking reform, Randle retained Class Counsel in April 2017. (Exhibit 5, Declaration of Suzanne E. Bish (hereinafter "Bish Decl."), ¶ 22.) Class Counsel thoroughly investigated her claims, including by interviewing other SunTrust FAs and researching and analyzing publicly available information regarding the company and its employment practices. (*Id.* ¶ 23.) After due diligence confirmed Ms. Randle's allegations and revealed what appeared to

---

[1] This motion incorporates by reference the definitions in the Settlement (Dkt. 56-1) and all capitalized terms not defined herein shall have the same meanings as set forth in the Settlement.

be a pattern of race discrimination, Class Counsel filed Ms. Randle's representative charge of race discrimination and retaliation with the EEOC in May 2017. (*Id.* ¶ 25.) Randle and Plaintiff Allison Taylor then filed this class action lawsuit in June 2018. (Dkt. 1.) After ongoing investigation and class member interviews, Class Counsel found Class Representatives Arthur Boyd and Tahir Johnson had similar experiences, and they later joined Randle and Taylor as Class Representatives seeking relief and reform for a class of African American SunTrust advisors. (Dkt. 16 ¶¶ 42–51; Bish Decl. ¶ 26.)

SunTrust vigorously opposed this case from its outset. It moved to dismiss all of Plaintiffs' individual and class claims and filed a 30-page memorandum in support. (Dkt. 18.) After full briefing and supplemental submissions, the Court denied Defendants' motion to dismiss in its entirety. (11/30/2020 Minute Order; Dkt. 34.) Shortly thereafter, Plaintiffs filed the Second Amended Complaint to add additional defendants following the merger of SunTrust and BB&T and subsequent name change of the merged business entity. (Dkt. 38.)

After the Court's denial of Defendants' motion to dismiss, the Parties conferred regarding class discovery and agreed to engage in private mediation to explore whether a settlement was possible prior to undertaking lengthy class discovery, class certification motion practice, trials on liability and damages, and potential appeals. (Bish Decl. ¶ 28.) Before agreeing to mediation, however, Plaintiffs demanded—and Defendants agreed to produce and regularly supplement—substantial discovery of the kind that Plaintiffs would have obtained in formal discovery. (*Id.*) This included documents regarding Defendants' policies and practices at issue and relevant workforce, human resources, compensation, and account data necessary to assess the class claims and damages. (*Id.*) Class Counsel—who have extensive experience litigating employment discrimination in the financial sector and thus are familiar with such policies and datasets—and

the Class Representatives—who learned about statistics and the law of employment discrimination to understand the information—reviewed the documents and data in detail. (*Id.* ¶¶ 29–30.) Class Counsel also retained an expert labor economist and statistician to review and analyze the workforce and client account data. (*Id.* ¶ 30.) Plaintiffs' expert analyzed the data thoroughly and conducted extensive studies and analyses regarding issues of liability and damages that informed Plaintiffs' mediation positions and negotiations. (*Id.*)

The Parties engaged Michael K. Lewis of JAMS, a highly experienced and respected professional mediator and neutral with substantial class action experience, including court appointments. (*Id.* ¶ 31–32.) With Mr. Lewis, the parties participated in their first mediation session on June 3, 2021. (*Id.*) This session was attended by Class Representatives, Class Counsel, external legal counsel for Defendants, and several senior Truist executives. (*Id.* At ¶ 32.) The Class Representatives gave candid and moving accounts of their experiences as SunTrust FAs. (*Id.*) Additionally, counsel for the Parties made lengthy presentations of their factual and legal arguments, and the results of expert data analysis. (*Id.*) The first round of mediation was unsuccessful. (*Id.*) The parties conducted another all-day mediation session on July 16, 2021, but were unsuccessful. (*Id.* at ¶ 33.)

After two unsuccessful mediation sessions, the negotiations came close to ending with no resolution. (*Id.*) To try to resurrect talks, Mr. Lewis supervised four additional meetings of attorneys and experts. (*Id.*) These productive meetings led the Parties to agree to engage in additional formal in-person mediation sessions attended by all parties. (*Id.*) The Parties held in-person mediations in Washington, D.C., on April 26, 2022 and August 25, 2022 with Class Representatives present. (*Id.* at ¶34.) During these mediation sessions, the Parties presented

additional factual and legal arguments and exchanged competing theories and calculations of damages. Mr. Lewis continued to mediate with the Parties through August 2023. (*Id.*)

After over two years of hard-fought negotiations, with multiple break-downs in the negotiations, in January 2023, the Parties successfully reached an agreement that, after several more telephonic sessions hammering out details with the assistance of Mr. Lewis, was memorialized in the Settlement Agreement before the Court. (*Id.*) The negotiations were hard-fought, with counsel for both sides advocating and negotiating vigorously and at arm's length on behalf of their clients until the Settlement Agreement was executed on August 3, 2023. (*Id.* ¶ 35.)

### B.  The Court Preliminarily Approved the Settlement

Plaintiffs moved for preliminary approval of the Settlement Agreement on August 4, 2023, and the Court granted preliminary approval of the Settlement and provisionally certified the Settlement Class on October 27, 2023. (Dkts. 56, 59.) In so doing, the Court found that "the Settlement Agreement is fair, reasonable, adequate, and the result of extensive, arm's length negotiations between experienced counsel and Parties." (Dkt. 59, at 3.) Finally, the Court found that the proposed plan for distributing the Notices "will provide the best notice practicable, satisfies the notice requirements on Rule 23(e), and satisfies all other legal and due process requirements." (*Id.* at 5.)

### C.  The Settlement Delivers Exceptional Programmatic and Monetary Relief

The proposed Settlement reached by the Parties (Dkt. 56-1) provides substantial monetary relief and valuable and meaningful Programmatic Relief for Class Members.

#### 1.    Programmatic Relief

The Settlement Agreement provides for meaningful programmatic relief to address the challenged practices and primary allegations at issue in this lawsuit and to level the playing field

for African American FAs. For a two-year period, Defendants have agreed to take action designed to enhance opportunities for employment, earnings, and advancement of African American FAs.

### 2.    FA Advisory Council

Defendants will create a FA Advisory Council that will meet on a biannual basis to discuss and address issues of diversity, equity, and inclusion facing African American FAs. (*Id.* § VII.E.) Defendants' Head of Wealth Brokerage will appoint a representative to attend each of the Council's meetings and to provide him feedback on issues raised and discussed. Further, Defendants will consult with and obtain feedback from the FA Advisory Council regarding a key issue in this lawsuit, the account distribution policy, and Defendants commit to review the impact of the policy on African American FAs on an annual basis. (*Id.* § VII.G.)

This type of programmatic relief has been shown to make a real difference in an organization's efforts to increase diversity and create equal opportunity. Harvard Professor Frank Dobbin, noted researcher and scholar on the effectiveness of diversity programs, has found, after analyzing 30 years of corporate data, that programs such as advisory councils are effective because they engage senior executives and encourage them to work voluntarily with minorities in a non-adversarial setting to eliminate harmful practices and boost diversity.[2] The creation of the FA Advisory Council incorporates Professor Dobbin's research findings by inviting Truist to listen, talk, and collaborate with FAs on issues facing African American FAs. (Bish Decl. ¶ 37.)

---

[2] Professor Dobbin is Chair of the Organizational Behavior Ph.D. Program at Harvard Business School and lead author of an article recently featured on the cover of the Harvard Business Review, *Why Diversity Programs Fail*. HARVARD BUS. REV. (July-Aug. 2016), https://hbr.org/2016/07/why-diversity-programs-fail.

### 3.    Efforts to Increase African American FA Representation and Retention

Defendants have agreed to devise and implement a plan to increase the number of African Americans in the candidate pools for FA positions (including both Investment Services Group and Private Client Group Financial Advisors). (*Id.* § VII.C.) In furtherance of this effort, Defendants will provide the Head of Wealth Brokerage with data and metrics concerning the hiring, retention, branch assignment, position, account distributions, teaming, performance— including but not limited to production, assets under management, and compensation—and attrition of FAs broken out by race on a biannual basis. (*Id.* § VII.D.) These metrics will allow Truist to assess the effectiveness of the programs implemented in this Settlement Agreement. Further, as part of its regular performance evaluation of Wealth Brokerage managers, Defendants will consider managers' involvement in Defendants' efforts to recruit diverse candidates for open FA positions, as well as their success in retaining diverse FAs. (*Id.* § VII.H.)

### 4.    Branch Assignments and Account Distributions

The Settlement also squarely addresses two of the key practices challenged in this case. To address the important assignment of bank branches and opportunities, Defendants will maintain a process for branch-based FAs to express an interest in a branch when an opening becomes available, and they will consider those FAs who have indicated an interest in a branch when making an assignment to or filling a vacancy at that branch. (*Id.* § VII.F.) In addition, Defendants will continue to implement their written and published policy governing the distribution of accounts from FAs who leave the firm. Defendants shall confirm that accounts are distributed according to the written policy and review the impact of the policy on African American FAs on an annual basis. As noted above, Defendants will consult with and obtain feedback from the FA Advisory Council regarding the account distribution policy. (*Id.* § VII.G.)

### D.  The Settlement Fund and Claims Resolution Process

Beyond the meaningful programmatic relief described above, the Settlement establishes a Settlement Fund of $14 million to provide meaningful compensation to Settlement Class Members. (Settlement § VIII.A.) Each Class Member who submits a timely claim will receive a minimum award of $25,000. In addition, the Settlement provides a unique individualized method of allocating monetary awards to Class Members. (*Id.* § IX.B.) Unlike most other discrimination settlements, monetary awards to the Class will not all be computed solely by formula based on factors such as weeks of employment. (*Id.*) Instead, this settlement provides an innovative individual Claims Resolution Program ("CRP") that will give Class Members the opportunity to receive monetary awards based on their individual experiences and the evaluation of an experienced Neutral Administrator, Mr. Lewis, who is well acquainted with the facts and allegations of this case through his role as mediator, and who this Court appointed to fulfill the duties laid out in the Settlement Agreement. (*Id.* § IX.D; Dkt. 59 at 4.) To ensure that the Neutral comprehensively and fairly assesses the Class Members' claims, Class Counsel will provide the Neutral with training and information regarding relevant Defendants' policies and practices and the legal theories and statistical analyses developed during the litigation. (*Id.* § IX.E.)

Settlement Class Members wishing to participate in the Settlement will complete and submit a detailed claim form. By submitting a claim form, Class Members have the opportunity to receive more—but in no event less—than $25,000. The claim form will provide Class Members the opportunity to explain in detail their experience as a SunTrust FA, any discrimination they believed they experienced, as well as any economic and emotional harm they suffered as a result. Class Members are permitted to submit up to 25 pages of additional supporting documentation they deem appropriate. Additionally, every Class Member may elect

to attend a 60-minute session with the Neutral to present aspects of his or her claim and answer questions from the Neutral.

Class Counsel will assist Settlement Class Members throughout the CRP by fielding calls, explaining their options and the claims process, answering questions, discussing Class Members' experiences, helping them complete and submit claim forms and supporting documents, and attending and assisting in the interview with the Neutral if they elect for such an interview. (*Id.* § IX.F; Bish Decl. ¶¶ 42–45.)

## II.    The Class Response to the Settlement Has Been Overwhelmingly Positive

The Claims Administrator has confirmed that it successfully delivered the Court-approved notice of the Settlement to all Class Members. (Exhibit 3, Declaration of Bryn Bridley (hereinafter "Bridley Decl."), ¶ 9.) The objection and opt-out period ended on December 26, 2023, and none of the Class Members objected to the Settlement or opted out. Reaction by Class Members to the Settlement has been overwhelmingly positive. (Bish Decl., ¶ 47.)

## ARGUMENT

## I.    The Settlement Is Fair, Reasonable, and Adequate and Should Be Approved

The Settlement provides outstanding relief to the class, and as the Court held in preliminary approval, "is fair, reasonable, adequate, and the result of extensive, arm's length negotiations between experienced counsel and Parties." (Dkt. 59, at 3.) As courts in this District have held, "[a] presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery." *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d 100, 104 (D.D.C. 2004) (internal quotations omitted). The Settlement is indeed fair, reasonable, and adequate: it is a strong result for the Class Members in view of the risks and costs of continued litigation, as

confirmed by the **zero** objections or opt-outs. Class Members will receive meaningful programmatic relief and a $14 million common fund that compares favorably to recent settlements in similar cases. Plaintiffs and Class Counsel are proud to recommend the Settlement.

Courts in this district operate "by the principle of preference favoring and encouraging settlements in appropriate cases given the long-standing judicial attitude favoring class action settlements." *Howard v. Liquidity Servs. Inc.*, No. 14-cv-1183, 2018 WL 4853898, at *3 (D.D.C. Oct. 5, 2018) (internal quotations and citations omitted). "Thus, '[a]bsent evidence of fraud or collusion, such settlements are not to be trifled with.'" *Id.* (quoting *Osher v. SCA Realty I, Inc.*, 945 F. Supp. 298, 304 (D.D.C. 1996) (alteration in original)). In evaluating a class action settlement, courts may consider whether (1) class counsel and class representatives adequately represented the class, (2) the settlement was negotiated at arm's length, (3) the relief provided for the class is adequate, and (4) the claims resolution process treats class members equitably relative to each other. *See* Fed. R. Civ. P. 23(e)(2). The Settlement here easily satisfies each of these factors.

**A. Class Representatives and Class Counsel Have Adequately Represented the Class**

As this Court found when it preliminarily appointed the Class Representatives and class counsel, "Plaintiffs and their counsel are adequate representatives of the class." (Dkt. 59 at 2.) Both the Class Representatives and Class Counsel have adequately and diligently represented the class. *See* Fed. R. Civ. P. 23(e)(2)(A). The Class Representatives took on professional risk and dedicated hundreds of hours to prosecuting this important case to a successful conclusion and outstanding result for their fellow Class Members. The Class Representatives did much more than lend their name to a lawsuit. Over the course of more than six years, they have dedicated

substantial time and energy to the successful prosecution of this case. They have been an invaluable resource for Class Counsel, aiding counsel's investigation, helping prepare EEOC charges and court pleadings, and attending and participating in many mediation sessions. (Bish Decl., ¶¶ 55–56.) Class Representatives have "vigorously prosecute[d] the interests of the class through qualified counsel," and "there is no conflict of interest between the" Class Representatives "and other members of the class." *Rogers v. Lumina Solar, Inc.*, No. 18-cv-2128, 2020 WL 3402360, at *6 (D.D.C. June 19, 2020) (quoting *Alvarez v. Keystone Plus Constr. Corp.*, 303 F.R.D. 152, 161 (D.D.C. 2014)); *see In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-cv-20000, 2020 WL 8256366, at *15 (N.D. Ala. Nov. 30, 2020) (adequacy of representation in settlement under Rule 23(e)(2)(A) can be decided on same grounds as adequacy of class representative under Rule 23(a)(4)).

     As detailed in their declarations, the Class Representatives were deeply involved in every aspect of the investigation and negotiation process. In addition to reviewing the extensive discovery produced by Defendants as part of mediation and participating in numerous meetings and conference calls, they each attended four mediation sessions, including traveling to Washington, D.C. to attend in person. (Randle Decl. ¶¶ 16–17; Taylor Decl. ¶¶ 17–18; Boyd Decl. ¶¶ 15–16; Johnson Decl. ¶ ¶¶ 15–16.)[3] All told, they each spent "hundreds of hours working with Class Counsel" and their fellow Class Representatives to achieve the best possible Settlement for the Class Members. (Randle Decl. ¶ 2; Taylor Decl. ¶ 2; Boyd Decl. ¶ 2; Johnson Decl. ¶ 2.) This Settlement is as much a product of their efforts as it is that of Class Counsel.

---

[3] Citations refer to the declarations of Class Representatives filed as exhibits to Plaintiffs' Motion for Service Awards filed concurrently with this motion.

Class Counsel, too, have adequately represented the Class. Class Counsel similarly invested substantial time, effort, and resources to assist the Class Representatives in securing an excellent result for the Class, including by interviewing and speaking with numerous Class Members, retaining an expert labor economist, engaging a respected mediator, and prosecuting the claims for more than six years. Class Counsel has extensive experience successfully litigating employment discrimination class action lawsuits, such as the seminal post-*Walmart* $160 million settlement on behalf of 1,400 Black financial advisors. *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 05-cv-6583 (Dec. 6, 2013 N.D. Ill.), ECF 616 (order granting final approval); *see also*, *Cremin v. Merrill Lynch*, 328 F. Supp. 2d 865, 866 (N.D. Ill. 2004) ("This lawsuit is a good example of the benefits of class action litigation."); *Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 259 (S.D.N.Y. 1998); *Slaughter v. Wells Fargo*, No. 13-cv-6368 (N.D. Ill.) ($35.5 million settlement); *Creighton v. Metlife*, No. 15-cv-8321 (S.D.N.Y.) ($32.5 million settlement); *Senegal v. JPMorgan Chase Bank, N.A.*, No. 18-cv-6006 (N.D. Ill.) ($24 million settlement); *Bland v. Edward Jones*, No. 18-cv-3673 (N.D. Ill.) ($34 million settlement).; *c.f. Alvarez*, 303 F.R.D. at 161 (finding class counsel adequate based on relevant past experience and prosecution of case).

### B.  The Settlement Was Vigorously Negotiated at Arm's Length

This Settlement is the product of extensive, arm's length negotiations between experienced counsel and parties. *See* Fed. R. Civ. P. 23(e)(2)(B). A class settlement that, like this one, is negotiated at arm's length, is presumed to be fair, adequate, and reasonable. *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d at 104. The negotiations occurred over the course of more than two years, during multiple conferences and meetings, and many mediation sessions facilitated by a well-respected, independent mediator. The Parties vigorously advocated for their

clients and hotly disputed the issues. (Bish Decl. ¶¶ 32–35.) The negotiations were protracted and difficult, and almost broke down on numerous occasions. (*Id.* ¶ 32–33.) The Class Representatives actively participated in the mediation process and insisted on continuing negotiations until they were satisfied that they had extracted as much monetary relief as possible and that they had crafted significant programmatic relief to benefit the Class. (Randle Decl. ¶¶ 16–19; Taylor Decl. ¶¶ 17–20; Boyd Decl. ¶¶ 15–18; Johnson Decl. ¶¶ 15–18.)

Moreover, the Class Representatives agreed to mediation only after Class Counsel obtained substantial discovery, including documents reflecting and related to the policies and practices challenged by the lawsuit and the employment workforce, human resources, compensation, and account data necessary to assess their claims and damages. (Bish Decl. ¶ 28.) Further, Class Counsel retained an expert labor economist to thoroughly review and analyze the data produced by Defendants and conducted extensive studies and analyses regrading issues of liability and damages that informed the Class Representatives and Class Counsel mediation positions and negotiations. (*Id.* ¶ 29.) The information the Parties have exchanged is more than sufficient to enable them, and the Court, to evaluate the Settlement. Based on their experience and an in-depth analysis of the merits, the record, and the risks of this action, Class Counsel enthusiastically recommend this Settlement to the Court. (*Id.* ¶ 46.) Not only does it remedy the challenged practices, but it also provides Class Members meaningful economic relief.

## C. The Relief Provided for the Class Is More Than Adequate

The meaningful programmatic relief and $14 million Settlement Fund that will be distributed to Class Members offers substantial and meaningful relief in view of the costs, risks, and delay of continued litigation. If approved, the $14 million common fund ranks consistently among the top five employment discrimination class action recoveries between 2018–2022, and

the guaranteed minimum award for each Settlement Class Member ranks among the top per capita recoveries of an employment discrimination case in 2021 and 2022.[4]  All factors this Court considers confirm that the Settlement is adequate: it is significant; it enjoys the unanimous approval of experienced Class Counsel and all Class Members; and it is an excellent result in light of the risks and costs of continued litigation.

Both Rule 23(e)(2)(C) and precedent in this Circuit provide guidance to evaluate the adequacy of a settlement, and this Settlement easily meets those factors. *See Stephens v. Farmers Rest. Grp.,* No. 17-cv-1087, 2019 WL 2550674, at *6 (D.D.C. June 20, 2019) (evaluating settlement relief both under enumerated Rule 23(e) factors and factors considered by courts in this district prior to 2018 amendments to Rule 23). Under Rule 23(e), the relief provided for the class must be "adequate, taking into account:" (1) "the costs, risks, and delay of trial and appeal"; (2) "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" and (3) "the terms of any proposed award of attorney's fees, including timing of payment."[5] Courts in the District of Columbia also consider (1) "the terms of the settlement in relation to the strength of plaintiffs' case;" (2) "the stage of the litigation proceedings at the time of settlement;" and (3) "the reaction of the class" and "opinion of experienced counsel." *Little v. Washington Metro. Area Transit Auth.*, 313 F. Supp. 3d 27, 34 (D.D.C. 2018) (internal quotations omitted). The Settlement easily satisfies each of these factors.

---

[4] *See infra* note 6.
[5] Courts also consider "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2). There is no such agreement in this case other than the Settlement Agreement itself.

1.  **The Settlement Will Deliver Outstanding Relief to the Class and Should Be Approved**

In evaluating a settlement's adequacy, courts consider the terms of the settlement "in relation to the strength of plaintiffs' case." *Little*, 313 F. Supp. 3d at 34. "[L]iability cannot be assumed when evaluating a proposed settlement," and "[t]he value of the settlement must be balanced against the likelihood of obtaining a substantial recovery at trial." *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 58–59 (D.D.C. 2010).

If this case were to proceed, "Defendants would seek to oppose class certification and disaggregate Plaintiffs' claims." *Alvarez*, 303 F.R.D. at 163–64 (considering this fact in weighing the settlement against the strength of the plaintiff's claims). Plaintiffs would also have to "prevail on the merits" and then it may be that "each individual class member would have had to demonstrate their monetary damages." *Little*, 313 F. Supp. 3d at 37 (considering these factors when "weigh[ing] the benefits from the Settlement Agreement against the strength of the Plaintiffs' case"). Although Class Counsel believes it would ultimately prevail, it also recognizes that "claims alleging systemic employment discrimination are difficult to win." *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 696 (N.D. Ga. 2001); *accord* Memorandum from Joe Cecil & George Cort, Fed. Judicial Ctr., to Judge Baylson, at 3 (Aug. 13, 2008), available at https://bit.ly/474x1km (in employment discrimination cases in federal court, summary judgment motions by defendants are more common, more likely to be granted, and more likely to terminate the litigation than other case types); *cf. Vista Healthplan, Inc. v. Warner Holdings Co. III*, 246 F.R.D. 349, 360 (D.D.C. 2007) (relying on fact that plaintiffs acknowledged that "antitrust conspiracy cases are complex and difficult, making victory uncertain" in considering the terms of the settlement relative to the strength of the case).

In light of this, the Settlement Fund of $14 million, negotiation of which was informed by expert analysis of wage disparities (Bish Decl., ¶ 29), provides exceptional monetary relief to the Settlement Class Members who allege they were harmed by the policies and practices challenged in this litigation. In fact, if approved, the $14 million common fund ranks consistently among the top five employment discrimination class action recoveries between 2018–2022.[6]  Further, this Settlement will provide a minimum payout of $25,000 to each class member who submits a claim form with an opportunity to receive more through the Claims Resolution Process. This $25,000 *minimum* award would be among the highest per capita awards in an employment discrimination class or collective action settlement in 2021 or 2022.[7]

In addition to the considerable settlement fund, Class Counsel and Class Representatives are particularly proud of the programmatic relief that Defendants have agreed to implement, which is of the type that has been shown to make a real difference in an organization's efforts to increase diversity and create equal opportunity.[8] The FA Advisory Council will create a platform for Truist FAs to speak to senior management about issues facing African American FAs. And Truist will consult with the Council regarding a key issue in this lawsuit, the account distribution policy, which will also be studied to determine whether there is an impact of the policy on African American FAs. Truist's commitment to collecting and providing to senior managers

---

[6] *See, e.g.*, SEYFARTH, *18th Annual Workplace Class Action Litigation Report* at 33–34, https://bit.ly/3FtlQGq (fifth largest employment discrimination class settlement in 2021 was $14 million); SEYFARTH, *17th Annual Workplace Class Action Litigation Report* at 33–34, https://bit.ly/3QtvoY6 (fourth and fifth largest employment discrimination class settlements in 2020 were $14 million); SEYFARTH, *16th Annual Workplace Class Action Litigation Report* at 33–34, https://bit.ly/45KG4WW (fifth largest employment discrimination class settlement in 2019 was $14 million); SEYFARTH, *15th Annual Workplace Class Action Litigation Report* at 33–34, https://bit.ly/3QvPpNN (fifth largest employment discrimination class settlement in 2018 was $10 million).
[7] *See* SEYFARTH, *18th Annual Workplace Class Action Litigation Report* at 33–34, https://bit.ly/3FtlQGq; SEYFARTH, *17th Annual Workplace Class Action Litigation Report* at 33–34, https://bit.ly/3QtvoY6.
[8] *See supra* note 2.

critical metrics based on race will allow Truist to assess the effectiveness of the programs implemented in this Settlement Agreement.

Given the risk that the Class may never recover and the substantial relief provided by the Settlement, the terms of the settlement are adequate.

### 2. Absent Settlement, Class Members Would Face Additional Costs, Risks, and Delay

Absent this Settlement, continued litigation of this action would be complex and lengthy, requiring the investment of considerable resources by both sides. The appropriateness of class certification and liability in this case is hotly contested, and both sides would face considerable risks should the litigation proceed. If this Class were certified outside of the settlement process, Class Counsel expects Defendants would file a Rule 23(f) appeal and, if necessary, a petition to the Supreme Court. Even if Plaintiffs overcame these risks—even if they obtained class certification, defeated the Defendants' merits defenses, and obtained a favorable liability verdict on behalf of the Class at trial—they still would not have been guaranteed a class-based recovery, as the Court might determine that separate individual damages trials were necessary, introducing additional risk and delay for each Class Member who sought a recovery. Each of these add risk, and at best, the Class could expect years more of litigation before any recovery.

In light of the potential outcomes and risks, this Settlement is an outstanding result that will provide significant monetary relief available to each and every Settlement Class Member, even though some may not have prevailed in their individual claims in court.[9] In contrast to the

---

[9] *See, e.g.*, Hon. Denny Chin, *Summary Judgment in Employment Discrimination Case: A Judge's Perspective*, 57 N.Y.L SCH. L. REV. 671, 672–73 (2013) (summary judgment is granted, in whole or in part, in employment discrimination cases approximately 77% percent of the time, a higher rate than other types of civil cases); *accord* Memorandum from Joe Cecil & George Cort, Fed. Judicial Ctr., to Judge Baylson, at 3 (Aug. 13, 2008), available at https://www.uscourts.gov/sites/default/files/sujulrs2.pdf (in employment discrimination cases in federal court, summary judgment motions by defendants are more common, more likely to be granted, and more likely to terminate the litigation than other case types).

complexity, delay, risk, and expense of continuing litigation, the proposed Settlement will produce prompt, certain, and substantial recovery for Settlement Class Members. Considering the complicated, uncertain, and lengthy litigation facing Settlement Class Members, the Settlement is plainly in the best interests of the class.

### 3.  The Claims Resolution Process Will Effectively Allocate Relief to the Class

"As with settlement agreements, courts consider whether distribution plans are fair, reasonable, and adequate." *In re Lorazepam & Clorazepate Antitrust Litig.*, No. 99-276, 2003 WL 22037741, at *7 (D.D.C. June 16, 2003). The Court should evaluate "the method of claims processing to ensure that it facilitates filing legitimate claims." FED. R. CIV. P. 23, committee notes to 2018 amendments. A distribution plan is "sufficient where . . . there is a rough correlation between the settlement distribution and the relative amounts of damages recoverable by Class Members." *Howard*, No. 14-cv-1183, at *7 (internal quotations omitted).

The Settlement creates an innovative process for fair allocation of the Settlement Fund. The Claims Resolution Process guarantees a payment of $25,000 to all Settlement Class Members who submit a timely claim form. Further, the Settlement Agreement provides Settlement Class Members a meaningful opportunity to have their claims individually assessed for potential additional recovery. Unlike many other settlements, Monetary Awards for Settlement Class Members will not be computed solely by formula. Instead, Settlement Class Members will submit a detailed Claim Form to explain their individual facts and circumstances and may elect to meet with the Neutral, with representation from Class Counsel, to elaborate on their SunTrust experience. The Parties exhaustively negotiated the design of this process to ensure Class Members received an individualized assessment of their claims, taking into account Class Members' alleged discrimination and retaliation, hostile work environment or wrongful

discharge, and consideration of alleged post-employment wage loss and any emotional distress. (Settlement § VIII.C.3–5.) In this way, Settlement Class Members' Monetary Awards will be directly tied to the damages they would allege from the claims they are releasing. (Bish Decl. ¶¶ 39–41.)

The Claims Resolution Process will be conducted by an experienced, well-qualified Neutral, Mr. Lewis, who this Court and other courts in this District have appointed in a similar capacity. *See, e.g.*, *Pigford v. Glickman*, 185 F.R.D. 82, 97 (D.D.C. 1999), *aff'd*, 206 F.3d 1212 (D.C. Cir. 2000); (Dkt. 59 at 4.) Mr. Lewis will review and assess the Claim Forms, meet with all Class Member who elect an interview, and carefully weigh their facts and circumstances to make final awards, ensuring fairness and consistency. Mr. Lewis is already well acquainted with this case as he worked extensively with the Parties as mediator for over two years. However, to ensure the best-informed decisions, Class Counsel will provide a detailed overview of Defendants' employment practices and the class claims to Mr. Lewis. Class Counsel will also assist and provide support for Settlement Class Members throughout the Claims Resolution Process by answering questions, helping them complete and submit Claim Forms, and representing them at their interview with the Neutral, if they so elect.

### 4. The Requested Attorneys' Fees Are Reasonable and Should Not Bear on the Adequacy of the Settlement

As explained more thoroughly in Plaintiffs' Motion for Attorneys' Fees and Costs, the requested attorneys' fees of 25% of the fund are reasonable in light of the extensive work and exceptional result, and are lower than awards in similar cases and the contracts executed pre-litigation by sophisticated Plaintiffs. *See Meyer v. Panera Bread Co.*, No. 17-cv-2565, 2019 WL 11271381, at \*9, 12 (D.D.C. Mar. 6, 2019), *report and recommendation adopted sub nom. Meyer v. Panera, LLC*, No. 17-cv-2565, 2019 WL 11271378 (D.D.C. Mar. 29, 2019) (approving

33.48% of common fund for attorneys' fees); *Kosen v. Am. Express Fin. Advisors, Inc.*, No. 02-cv-0082 (D.D.C. June 16, 2002), ECF No. 15 (awarding class counsel 35% of fund for fees and costs in employment discrimination class action that settled before discovery); (Bish Decl. ¶¶ 22, 24, 33; Randle Decl. ¶ 13; Taylor Decl. ¶ 14; Boyd Decl. ¶ 11; Johnson Decl. ¶ 9.) Further, substantive discussions of attorneys' fees were deferred until after an agreement was reached on the other terms of the settlement agreement, (Bish Decl., ¶ 63), and this Circuit's percentage-of-the-fund method "guard[s] against potential abuses" as counsel's and class members interests are aligned, *Hubbard v. Donahoe*, 958 F. Supp. 2d 116, 124 (D.D.C. 2013); *cf. True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1078 (C.D. Cal. 2010) ("Where the class payment and fees are negotiated together, there is thus a concern that class counsel engaged in a tradeoff between merits relief and attorney's fees." (internal quotations omitted)).

### 5. The Settlement Is Adequate in Light of the Stage of the Litigation Proceedings

In evaluating this factor, courts generally "consider whether counsel had sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-a-vis the probability of success and range of recovery." *Alvarez*, 303 F.R.D. at 164 (quoting *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 117 (D.D.C. 2007)). "The settlement must 'not come too early to be suspicious nor too late to be a waste of resources,' but instead should occur 'at a desirable point in the litigation for the parties to reach an agreement and to resolve the[ ] issues without further delay, expense, and litigation.'" *Howard*, 2018 WL 4853898, at *6 (quoting *In re Vitamins*, 305 F. Supp. 2d at 105) (alteration in original).

Here, the Settlement was reached following dispositive motion practice and after substantial exchange of key information necessary to fully evaluate the claims and potential damages. (Bish Decl. ¶¶ 27–29.) Defendants produced substantial class-wide discovery of the

kind that Plaintiffs would have obtained in formal discovery. This discovery permitted Class

Counsel to retain an expert labor economist and statistician to review and analyze the workforce

and account data and conduct extensive studies and analyses regarding issues of liability and

damages, which informed Plaintiffs' mediation positions and negotiations. (*Id.* ¶ 29.)

This Settlement does not come too early, as this discovery provided each Party with

sufficient information to assess settlement against the risks of continued litigation. Nor does this

Settlement come too late, after extensive resources were expended on class certification or merits

briefing.

### 6. The Positive Reaction of the Class and the Opinion of Experienced Class Counsel Support the Settlement's Adequacy

The class reaction has been overwhelmingly positive. Since this Court granted

preliminary approval, the Claims Administrator issued notice to the Class Members. It appears

that every Class Member received notice. (Bridley Decl. ¶ 7.) No Class Member has objected,

nor have any Class Members opted out. (*Id.* ¶¶ 8–9.) All four of the Class Representatives fully

endorse the Settlement. "This factor therefore unambiguously weighs in favor of approval."

*Alvarez*, 303 F.R.D. at 164 (approving class action in part because there were no opt outs or

objections).

"[C]ourts generally agree that 'the opinion of experienced counsel should be afforded

substantial consideration by a court in evaluating the reasonableness of a proposed settlement.'"

*Rogers*, 2020 WL 3402360, at *10 (quoting *Alvarez*, 303 F.R.D. at 164). Class Counsel has

decades of experience in prosecuting employment discrimination class actions. (Bish Decl., ¶¶ 7-

13.) Class Counsel has carefully analyzed the record, spoken with many Class Members, worked

closely with Class Representatives, and heavily debated the legal and factual issues with

opposing counsel. Based on its experience and an in-depth analysis of the merits, record, and

risks of this action, Class Counsel enthusiastically recommends this Settlement to the Court for final approval. (*Id.*, at ¶ 46.)

### D. The Claims Resolution Process Treats Class Members Equitably

The Claims Resolution Process will ensure a fair and equitable distribution of the Settlement Fund. As explained in more detail above, *see supra* III.C.2, unlike most employment settlement allocation plans, the Claims Resolution Process will distribute the settlement fund equitably by tailoring each class members' award based on his or her individualized facts, circumstances, and harm. In this way, Settlement Class Members' Monetary Awards will be directly tied to the damages they would allege from the claims they are releasing. *See Howard*, 2018 WL 4853898, at \*7 (explaining that a distribution plan is "sufficient where . . . there is a rough correlation between the settlement distribution and the relative amounts of damages recoverable by Class Members." (internal quotations omitted)); Fed. R. Civ. P. 23, committee notes to 2018 amendments (explaining that courts should consider whether "apportionment of relief among class members takes appropriate account of differences among their claims").

### II. The Settlement Class Meets Rule 23 and Should Be Certified

On October 27, 2023, this Court provisionally certified the class for settlement purposes, finding that it satisfied the requirements of Rule 23(a), along with the requirements of Rule 23(b)(2) and Rule 23(b)(3). (Dkt. 59, at 2.) Plaintiffs now move to certify, for settlement purposes, a class consisting of all individuals who were employed by SunTrust Investment Services, Inc. ("STIS") as a Financial Advisor at any time between June 24, 2014 and February 17, 2021 and who self-identified to STIS as African American and/or Black, as reflected in Defendants' workforce data, which was used to develop the class list provided by Defendants to Class Counsel.

### A.  The Class Meets All Requirements of Rule 23(a)

The proposed Class meets all requirements of Rule 23(a) as "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;" and "(4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a).

In assessing numerosity, courts consider "(1) 'judicial economy arising from avoidance of a multiplicity of actions'; (2) 'geographic dispersion of class members'; (3) 'size of individual claims'; (4) 'financial resources of class members'; and (5) 'the ability of claimants to institute individual suits.'" *Coleman ex rel. Bunn v. District of Columbia*, 306 F.R.D. 68, 80 (D.D.C. 2015) (certifying class over numerosity challenge). There is substantial judicial economy from resolving the Class Members' claims together rather than through many lawsuits, given the common challenges to Firm-wide policies. Moreover, the Class is geographically dispersed, as it covers all self-identified Black and/or African American Financial Advisors who worked for SunTrust over a seven-year period anywhere in the country. The Named Plaintiffs bear this out: Randle and Johnson worked in Maryland and Washington D.C., Taylor in Virginia, and Boyd in Florida. (SAC ¶¶ 8–11); see *J.D. v. Azar*, 925 F.3d 1291, 1323 (D.C. Cir. 2019) (per curiam) (affirming class certification and noting that geographical dispersion is among the criteria that makes joinder more impracticable). Finally, employment discrimination claims challenging policies are expensive to prosecute, and some Class Members are current employees who would have great difficulty suing their current employer.

Commonality is often found where "plaintiffs allege widespread wrongdoing by a defendant" and "a uniform policy or practice that affect all class members," as Plaintiffs do here.

23

*Thorpe v. District of Columbia*, 303 F.R.D. 120, 145 (D.D.C. 2014) (citation omitted). As alleged in the Second Amended Complaint, Plaintiffs identified common questions of law and fact that meet Rule 23(a)(2), including whether the Defendants engaged in a pattern or practice of racial discrimination and whether Defendants' uniform, company-wide policies and practices regarding compensation, teaming, and the assignment of territory, resources, designations, and business opportunities had an unlawful disparate impact on Black/African American FAs. *See Taylor*, 241 F.R.D. at 40, 48 (certifying class of Black employees in Title VII action in part due to discriminatory compensation policies and practices). Determination of the truth or falsity of these allegations would "resolve an issue that is central to the validity" of each Class Member's claim "in one stroke," thereby satisfying the commonality requirement. *In re District of Columbia*, 792 F.3d 96, 99 (D.C. Cir. 2015) (internal quotations omitted); *Slaughter v. Wells Fargo*, No. 13-cv-6368 (May 4, 2017 N.D. Ill.), ECF 113 (finding commonality and granting final approval of class of Black bank branch-based FAs); *Senegal v. JPMorgan Chase Bank, N.A.*, No. 18-cv-6006 (Dec. 20, 2018 N.D. Ill.), ECF 40 (same).

The Class Representatives' claims are typical of the Class claims because they, like the Class, are Black/African American, meet the definition of class membership, and were subjected to and harmed by the same discriminatory policies and practices challenged in this litigation. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 & 157 n.13 (1982); *Cook v. Billington*, No. 82-cv-0400, 1988 WL 142376, at *4 (D.D.C. Dec. 13, 1988) (finding named plaintiffs met typicality requirement when they "allege that they and the proposed class have suffered from the same employment practice").

Class Representatives have protected the interests of the class fairly and adequately. As explained above, they have devoted considerable time to meeting with Class Counsel and

participating in the negotiation of this Settlement. Class Representatives retained experienced

Class Counsel, who have regularly been appointed class counsel, including in several other

employment discrimination class action lawsuits on behalf of a class of Black financial advisors.

(Bish Decl., ¶¶ 6–13.)

### B.   The Class Meets the Requirements of Rule 23(b)(2) and 23(b)(3)

Certification under Rule 23(b)(2) is warranted because Plaintiffs allege that Defendants

"acted or refused to act on grounds that apply generally to the class, so that final injunctive relief

or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV.

P. 23(b)(2). This provision applies where an injunction can "provide relief to each member of the

class" and was designed for "civil rights cases like this, . . . when common claims arise from

systemic harms that demand injunctive relief." *D.L. v. District of Columbia*, 860 F.3d 713, 726

(D.C. Cir. 2017) (citations omitted). Plaintiffs allege that every Class Member was subject to

Firm-wide policies and practices that harmed Black/African American FAs, including policies

and practices regarding compensation, teaming, and the assignment of clients, territory and bank

branches, resources, designations, and other business opportunities. Thus, as this Court

preliminarily found, (Dkt. 59 at 2), the Class is certifiable under Rule 23(b)(2).

The Class is also properly certified under Rule 23(b)(3). The common factual and legal

issues and proof of class-wide liability and common damages questions this case presents are

"questions of law or fact common to class members that predominate over any questions

affecting individual members," and a class action is therefore "superior to other available

methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3); *see*

*Moore v. Napolitano*, 926 F. Supp. 2d 8, 33 (D.D.C. 2013) (finding predominance and

superiority in Title VII pattern and practice race discrimination case); *Chi. Tchrs. Union v. Bd. of*

*Educ. of City of Chi.*, 797 F.3d 426, 443–45 (7th Cir. 2015) (Rule 23(b)(2) and 23(b)(3)

certification in case for injunctive and monetary relief). As courts routinely recognize that class

actions are more efficient than individual actions and will promote uniformity in decisions."

*Amchem Prod., Inc.*, 521 U.S. 591, 615 (1997).

The Parties' Settlement is also relevant to the Rule 23(b)(3) analysis. *Amchem Prods.,*

*Inc.*, 521 U.S. at 619–20. Any manageability or predominance concerns relating to individual

proceedings and defenses are satisfied by the Settlement and its Claims Resolution Process. *See*

*In re APA Assessment Fee Litig.*, 311 F.R.D. 8, 18 (D.D.C. 2015) ("[T]he existence of a

settlement that eliminates manageability problems can alter the outcome of the predominance

analysis." (internal quotations omitted)).

## III.   The Notice Provided to the Class Satisfies Due Process

A settlement must provide adequate notice to class members so they can make an

informed choice about whether to opt out, object, and/or file a timely claim for a monetary

award. *In re Domestic Airline Travel Antitrust Litig.*, 322 F. Supp. 3d 64, 68 (D.D.C. 2018)

(explaining that a notice is "adequate and satisfies Rule 23 and due process if it 'fairly apprise[s]

the prospective members of the class of the terms of the proposed settlement and of the options

that are open to them in connection with the proceedings.'" (quoting *Wal-Mart Stores, Inc. v.*

*Visa U.S.A., Inc.*, 396 F.3d 96, 114–15 (2d Cir. 2005) (alteration in original)). Notice to class

members must be "directed to class members in a reasonable manner." Fed. R. Civ. P. 23(e)(1);

*see also In re Domestic Airline Travel Antitrust Litig.*, 322 F. Supp. 3d at 68 ("Notice need only

be reasonably calculated to reach the class in order to satisfy due process.").

In this case, the notices reviewed and approved by the Court were clear, accurate, and

satisfied due process. The notices plainly stated the terms of the Settlement and the Class

Members' options for proceeding. The Claims Administrator mailed the Class Notices to each Class Member, and it appears that all Class Members received notice. (Bridley Decl., ¶ 7.) The Claims Administrator also established a website describing the Settlement and its terms and containing links to view and download copies of all key documents, including the Settlement Agreement, the Second Amended Complaint, the notice, and the Preliminary Approval Order. Since the notice has been mailed, the website has received 90 visits. (*Id.*, ¶ 10.)

On August 10, 2023, Defendants sent notices of the proposed Settlement to the Attorney General of the United States and to the Attorneys Generals of all states and territories in which Class Members reside consistent with the Class Action Fairness Act, 28 U.S.C. § 1715(d). (Exhibit 4, Declaration of Elena D. Marcuss, ¶ 4.). Defendants have not yet received any response to the CAFA notice. (*Id.* ¶ 5.)

The Proposed Notices of Final Approval, attached as Exhibit 2, clearly, fully, and fairly inform Class Members of the terms of the Settlement and their rights to participate in the Settlement, how to do so, and who to contact if they need assistance. These notices plainly satisfy due process.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court give final approval to the Settlement and certify the Class for settlement purposes.

Dated: January 12, 2024

<div style="margin-left: 3em;">

Respectfully submitted,
**STOWELL & FRIEDMAN, LTD.**

By:___*/s/ Suzanne E. Bish*_____
    Linda D. Friedman (pro hac vice)
    Suzanne E. Bish (pro hac vice)
    George S. Robot
    Stowell & Friedman
    303 W. Madison St., Ste. 2600

</div>

Chicago, IL 60606
Telephone: (312) 431-0888
lfriedman@sfltd.com
sbish@sfltd.com
grobot@slftd.com