## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TRACY RANDLE, ALLISON TAYLOR, ARTHUR BOYD, and TAHIR JOHNSON, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>SUNTRUST BANKS, INC., SUNTRUST INVESTMENT SERVICES, INC., TRUIST FINANCIAL CORPORATION, and TRUIST INVESTMENT SERVICES, INC.,<br><br>        Defendants. | Civil Action No.: 1:18-cv-01525-TJK<br><br>**Hon. Judge Timothy Kelly**<br><br>**Jury Trial Requested** |

## PLAINTIFFS' UNOPPOSED MOTION FOR SERVICE AWARDS TO CLASS REPRESENTATIVES AND ATTORNEYS' FEES AND COSTS

Linda D. Friedman (admitted *pro hac vice*)
Suzane E. Bish (admitted *pro hac vice*)
George S. Robot
STOWELL & FRIEDMAN, LTD.
303 W. Madison St.,
Suite 2600
Chicago, IL 60606
(312) 431-0888
lfriedman@sfltd.com
grobot@sfltd.com
sbish@sfltd.com

## **TABLE OF CONTENTS**

BACKGROUND ................................................................................................................... 3

ARGUMENT ....................................................................................................................... 5

I.  Service Awards Are Warranted For The Class Representatives' Tireless And Courageous
Work Achieving An Outstanding Result For The Class.................................................... 5

   A.  The Class Representatives Spent Hundreds of Hours Actively Participating in the
Litigation and Mediation For The Benefit Of The Class.............................................. 7

   B.  The Class Representatives Publicly Associated Themselves With This Case At Great
Personal Cost And Executed A Broader Release Than The Class Members ............. 11

   C.  The Class Benefitted Significantly from The Class Representatives' Actions........... 12

   D.  The Service Award Requested For Each Class Representative Is Reasonable And
Within The Bounds Of What Courts Have Awarded In Similar Employment
Discrimination Class Actions .................................................................................... 13

II.  The Attorneys' Fees And Costs Sought By Class Counsel Are Reasonable In Light Of
The Work Invested And Settlement Achieved For The Class ........................................ 16

   1.  The Size of the Fund and Per Capita Recovery Justifies the Fee Request ................. 19

   2.  The Lack of Objections by Class Members Further Weighs in Favor of Awarding
Class Counsel's Requested Fees ................................................................................ 20

   3.  Experienced Class Counsel Litigated a Complex and Lengthy Case with Skill and
Efficiency .................................................................................................................. 20

   4.  This Case Was Lengthy and Complex........................................................................ 21

   5.  Class Counsel Devoted Significant Time and Resources While Risking
Nonpayment .............................................................................................................. 23

   6.  The Requested Fee Award is Lower Than Awards in Similar Cases ......................... 25

   7.  The Costs Requested by Class Counsel Are Reasonable and Were Necessarily
Incurred to Achieve the Benefit Obtained ................................................................. 26

## TABLE OF AUTHORITIES

**Cases**

*Bland v. Edward Jones*, No. 18-cv-3673 (N.D. Ill.) ................................................................ 15, 21

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) .......................................................................... 16

*Bynum v. D.C.*, 412 F. Supp. 2d 73 (D.D.C. 2006) ....................................................................... 26

*Castillo v. Noodles & Co.*, No. 16-cv-03036, 2016 WL 7451626 (N.D. Ill. Dec. 23, 2016) ....... 14

*Chen-Oster v. Goldman Sachs & Co.*, No. 10-cv-6950, 2023 WL 7325264 (S.D.N.Y.
    Nov. 7, 2023) .......................................................................................................................... 15

*Cobell v. Jewell*, 29 F. Supp. 3d 18 (D.D.C. 2014) .......................................................................... 6

*Connolly v. Weight Watchers N. Am. Inc.*, No. 14-cv-01983, 2014 WL 3611143 (N.D. Cal. July
    21, 2014) ................................................................................................................................ 14

*Creighton v. Metlife*, No. 15-cv-8321 (S.D.N.Y.) ........................................................................... 21

*Curtis-Bauer v. Morgan Stanley & Co.*, No. 3:06-cv-3903, Dkts. 158 at 5–8 (N.D. Cal.
    Feb. 7 & Oct. 22, 2008) ......................................................................................................... 12

*Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*, 3 F.3d 1568
    (D.C. Cir. 1993) ..................................................................................................................... 18

*Frank v. Eastman Kodak Co.*, 228 F.R.D. 174 (W.D.N.Y. 2005) .................................................. 14

*Guippone v. BH S & B Holdings*, LLC, No. 09-cv-01029, 2011 WL 5148650 (S.D.N.Y.
    Oct. 28, 2011) ........................................................................................................................... 9

*Hartman v. Pompeo*, No. 77-cv-2019, 2020 WL 6445873 (D.D.C. Nov. 3, 2020) ...................... 16

*Howard v. Liquidity Servs. Inc.*, No. 14-cv-1183, 2018 WL 4853898 (D.D.C. Oct. 5, 2018) .... 21,
    25, 27

*Hubbard v. Donahoe*, 958 F. Supp. 2d 116 (D.D.C. 2013) .......................................................... 18

*Hyun v. Ippudo USA Holdings*, No. 14-cv-8706, 2016 WL 1222347 (S.D.N.Y.
    Mar. 24, 2016) ....................................................................................................................... 16

*In re Baan Co. Sec. Litig.*, 288 F. Supp. 2d 14 (D.D.C. 2003) ..................................................... 16

*In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82 (D.D.C. 2013) ..................... 16, 26

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d 94
    (D.D.C. 2013) .................................................................................................................... 19, 27

*In re First Databank Antitrust Litig.*, 209 F. Supp. 2d 96 (D.D.C. 2002) .................................... 26

*In re Lorazepam & Clorazepate Antitrust Litig.*, No. 99-0276, 2003 WL 22037741
    (D.D.C. June 16, 2003) ....................................................................................................... 6, 26

*In re Vitamins Antitrust Litig.*, No. MDL 1285, 2001 WL 34312839 (D.D.C.
    July 16, 2001) .................................................................................................................... 18, 26

*Ingram v. Coca-Cola Co.*, 200 F.R.D. 685 (N.D. Ga. 2001) .................................................. 15, 24

*Kifafi v. Hilton Hotels Ret. Plan*, 999 F. Supp. 2d 88 (D.D.C. 2013) ..................................... 20, 22

*Kosen v. American Express Financial Advisors, Inc.*, No. 02-cv-0082, (D.D.C.
    June 16, 2002) ............................................................................................................ 2, 17, 22, 26

*Little v. Washington Metro. Area Transit Auth.*, 313 F. Supp. 3d 27 (D.D.C. 2018) ........... passim

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 05-cv-6583,
    Dkt. 616 (N.D. Ill. Dec. 6, 2013) ...................................................................................... 15, 21

*Meyer v. Panera Bread Co.*, No. 17-cv-2565, 2019 WL 11271381 (D.D.C.
    Mar. 6, 2019) ................................................................................................................ 2, 17, 25

*Meyer v. Panera, LLC*, No. 17-cv-2565, 2019 WL 11271378 (D.D.C. Mar. 29, 2019) ... 2, 17, 25

*Mills v. Capital One, N.A.*, No. 14-cv-1937, 2015 WL 5730008 (S.D.N.Y. Sept. 30, 2015) ....... 16

# TABLE OF AUTHORITIES
## (con't)

**Page**

*Roberts v. Texaco, Inc.*, 979 F. Supp. 185 (S.D.N.Y. 1997)....................................................... 14, 16

*Senegal v. JPMorgan Chase Bank, N.A.*, No. 18-cv-6006, Dkt. 40 at 5 (N.D. Ill. Dec. 20, 2018), *aff'd*, 939 F.3d 878 (7th Cir. 2019) ..................................................... 15, 16, 21

*Slaughter v. Wells Fargo Advisors, LLC*, No. 13-cv-06368, Dkt. 113 (N.D. Ill. May 4, 2017).............................................................................................................................. 15, 21

*Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993) ............................................ 18, 26

*Tuten v. United Airlines, Inc.*, 41 F. Supp. 3d 1003 (D. Colo. 2014) .......................................... 14

*Velez v. Novartis Pharms. Corp.*, No. 04-cv-09194, 2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) ......................................................................................................................... 12, 14

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .................................................................. 24

*Wells v. Allstate Ins. Co.*, 557 F. Supp. 2d 1 (D.D.C. 2008)............................................... 6, 19, 25

**Other Authorities**

*Barry Sullivan & Amy K. Trueblood*, Rule 23(f): A Note on Law and Discretion in the Courts of Appeals, 246 F.R.D. 277, 286 n.43, 290–91 (2008) .......................................... 25

Hon. Denny Chin, *Summary Judgment in Employment Discrimination Case: A Judge's Perspective*, 57 N.Y.L Sch. L. Rev. 671, 672–73 (2013) ........................................................ 24

T. Eisenberg & G. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 ULCA L. Rev. 1303, 1308 (2006) ....................................................................................... 14, 15

When the Class Representatives and Class Counsel embarked on this case in 2017, they faced a principled, important, and arduous journey that was not without risk. Yet, Class Counsel and the Class Representatives successfully navigated this difficult terrain by thoroughly investigating and developing Plaintiffs' class claims and evidence, analyzing Defendants' employment practices and workforce data, successfully litigating a motion that sought to end the case, and engaging in protracted, difficult negotiations against competent counsel for well-resourced, sophisticated Defendants. In the end, the Class Representatives and Class Counsel achieved an extraordinary result for the class, delivering targeted and meaningful programmatic relief to improve employment outcomes for African American Financial Advisors and a $14 million Settlement Fund, with a guarantee to each Class Member who timely submits a claim of at least $25,000, and an opportunity to receive more through an innovative individualized Claims Resolution Process.

Class Representatives Tracy Randle, Allison Taylor, Arthur Boyd, and Tahir Johnson made the courageous and risky decision to publicly sue their employer for race discrimination on behalf of their fellow Black/African American peers employed by Defendants. This undertaking is more than signing a name on a document; Class Representatives dedicated hundreds of hours over several years to prosecuting the case, aiding Class Counsel's investigation, learning substantive law and analyzing the Defendants' policies and workforce data, and attending and presenting at challenging mediation sessions. Their substantial risk and hard work resulted in a $14 million Settlement Fund for the Class Members with a guaranteed minimum of $25,000 per capita recovery and meaningful programmatic relief—an exceptional achievement and among the top five largest settlements in each of the between 2018–2022. *See infra* note 3. Accordingly, Class Counsel is honored to request that the Court award each of the Class Representatives a

service award for their time, courage, and hard work on behalf of the Class. The service awards were clearly disclosed to class members in the court-approved Notice and no class member has objected to their award.

Class Counsel also respectfully requests an award of attorneys' fees of 25% of the Settlement Fund, or $3.5 million. (Bish Decl., ¶ 60[1]). This 25% rate is lower than the 33⅓% contract rate that the Class Representatives negotiated and agreed to at the onset of the case, and is lower than awards granted by other courts in this district in employment cases that result in common funds. *See, e.g.*, *Meyer v. Panera Bread Co.*, No. 17-cv-2565, 2019 WL 11271381, at *9 (D.D.C. Mar. 6, 2019), *report and recommendation adopted sub nom. Meyer v. Panera, LLC*, No. 17-cv-2565, 2019 WL 11271378 (D.D.C. Mar. 29, 2019) (approving 33.48% of common fund for attorneys' fees); *Kosen v. American Express Financial Advisors, Inc.*, No. 02-cv-0082, (D.D.C. June 16, 2002), ECF No. 15 (awarding class counsel a 35% of fund for fees and costs in employment discrimination class action that settled before discovery). Class Counsel's commitment of time and resources will continue after final approval, as Class Counsel has committed to assisting Class Members throughout the Claims Resolution Process no matter how many requests for help, which will result in substantial additional legal and administrative work. (Bish Decl., ¶¶ 67–68.) Finally, Class Counsel also seeks reimbursement of reasonable costs incurred in successfully prosecuting this matter.

As a result, and for the reasons described below, the requests for service awards, fees and costs are reasonable and should be granted.

---

[1] This citation references the Declaration of Suzanne E. Bish, attached as Exhibit 5 to Plaintiff's Motion For Final Approval of Class Action Settlement, filed concurrently with this motion. Bish's Declaration is cited throughout both motions. (Dkt. 62-5.)

## BACKGROUND

In April 2017, Tracy Randle, an African American former SunTrust financial advisor ("FA"), retained Class Counsel to represent her with respect to her claims of race discrimination against the Firm. After extensive investigation, Plaintiff Randle filed a representative charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in May 2017, alleging SunTrust was engaged in a company-wide pattern or practice of race discrimination and employed policies or practices that have an unlawful disparate impact on African American FAs. After obtaining a Notice of Right to Sue from the EEOC and following Class Counsel's research and analysis of publicly available information and interviews of putative Class Members, Class Representatives Randle and Taylor filed the initial class action complaint (Dkt. 1) in June 2018, bringing individual and class-wide race discrimination and individual retaliation claims under 42 U.S.C. § 1981 and 42 U.S.C. § 2000e *et seq*. Plaintiffs later amended the complaint to add Class Representatives Arthur Boyd and Tahir Johnson, who experienced similar discrimination. (Dkt. 16.)

This lawsuit alleges that Defendants are engaged in a pattern or practice of race discrimination and maintain Firm-wide policies and practices that have an unlawful disparate impact against African American FAs, resulting in substantial racial disparities in compensation and attrition, among other things. (Dkt. 38 at ¶¶ 18–19.) Plaintiffs allege that under these Firm-wide practices, African American FAs are denied client account distributions, business opportunities, and resources, and are assigned to less lucrative bank branches and territories, including by race-matching them to territories with higher African American and minority populations and branches with fewer or no licensed banker support. (*Id.* at ¶¶ 18–21.) Further, African American FAs are almost entirely excluded from the Firm's most lucrative

3

designations—Hub Advisor, Wealth Advisor, etc.—and therefore denied the opportunity to service the Firm's highest net-worth clients and receive accompanying compensation and advancement opportunities. (*Id.* at ¶ 22.) African American FAs are also disproportionately excluded from favorable teams and pools. (*Id.* at ¶ 23.)

In January 2019, Defendants moved to dismiss Plaintiffs' complaint in its entirety. (Dkt. 18.) After full briefing and supplemental submissions (Dkts. 29–30), the Court denied Defendants' motion to dismiss. (Nov. 30, 2020 Minute Order; Dec. 14, 2020 Trans. of Status Hearing.) Following the Court's order, the Parties engaged in private mediation in an attempt to settle this dispute before undertaking lengthy class discovery, class certification motion practice, trials on liability and damages, and potential appeals.

To perform their due diligence and properly negotiate on behalf of the Class. Plaintiffs sought, and Defendants agreed to produce, substantial discovery of the kind that they would have obtained in formal discovery, including documents reflecting and related to the policies and practices challenged by the lawsuit and the employment workforce, human resources, compensation, and account data necessary to assess their claims and damages. Class Counsel retained an expert labor economist to review and analyze the workforce and account data, which Defendants supplemented as necessary. Plaintiffs' expert analyzed the data thoroughly and conducted extensive studies and analyses regarding issues of liability and damages that informed their mediation positions and negotiations. Class Counsel continued to investigate the Firm and its policies and practices, interview Class Members, and study publicly available information.

The Parties retained Michael K. Lewis, a nationally well-known and experienced mediator, and engaged in difficult, lengthy, arm's-length negotiations over the course of more than two years, including four days of formal mediation sessions, multiple additional sessions

with the mediator, and conferences among counsel. Senior Truist executives and all Named

Plaintiffs attended, and prepped for, these mediation sessions. At the sessions, the Parties made

lengthy presentations of their factual and legal arguments, expert data analysis, and theories of

damages. The Class Representatives worked diligently on behalf of the class, and actively

participated in every aspect of the settlement process. Understanding and fulfilling their fiduciary

duties to the Class, they travelled to attend multiple mediation sessions and worked hard to

become fully informed of the facts, law, and their expert's data analyses and findings. They also

participated in lengthy information sharing and strategy meetings with Class Counsel before and

after mediation sessions.

The Parties' efforts culminated in the $14,000,000 Settlement Agreement, guaranteeing a

minimum per capita recovery of $25,000—among the top five largest in each of the past four

years. *See infra* note 3. The Settlement Agreement is the product of hard-fought, principled

negotiations facilitated and overseen by a well-respected mediator. This Court reviewed and

granted preliminary approval.

## **ARGUMENT**

### I.    **Service Awards Are Warranted for the Class Representatives' Tireless and Courageous Work Achieving an Outstanding Result for the Class**

Class Representatives Randle, Taylor, Boyd, and Johnson's brave choice to initiate and

participate in this lawsuit, forever attaching their names to it, was essential to obtaining the

significant relief their fellow Class Members will enjoy. They were more than named plaintiffs

on a caption—they were committed, active, and true representatives of their Class. Their active

role throughout the case, from pre-suit investigation through litigation and multiple challenging

mediation sessions, was essential to achieving significant programmatic and monetary relief for

their fellow Class Members. As a result, Class Counsel are proud to request service awards for each Class Representative.

"It is common for courts to approve incentive awards in class-action litigations, especially when there is a common fund created to benefit the entire class." *Little v. Washington Metro. Area Transit Auth.*, 313 F. Supp. 3d 27, 35 (D.D.C. 2018). Indeed, in common-fund cases such as this one, courts "routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *In re Lorazepam & Clorazepate Antitrust Litig.*, No. 99-0276, 2003 WL 22037741, at *10 (D.D.C. June 16, 2003) (internal quotations omitted).

In deciding whether to grant incentive awards and the amounts of such awards, courts consider factors such as: (1) "the actions the plaintiff has taken to protect the interests of the class," (2) "the degree to which the class has benefitted from those actions;" and (3) "the amount of time and effort the plaintiff expended in pursing the litigation." *Wells v. Allstate Ins. Co.*, 557 F. Supp. 2d 1, 8–9 (D.D.C. 2008) (internal quotations omitted). In particular, courts consider the "financial or reputational risk undertaken in bringing the action." *Cobell v. Jewell*, 29 F. Supp. 3d 18, 25 (D.D.C. 2014), *aff'd in part, vacated in part on other grounds*, 802 F.3d 12 (D.C. Cir. 2015).

The Court should approve the service awards listed in the Settlement Agreement for Class Representatives who invested enormous time and effort pursuing this litigation and protecting the interest of the Class at great personal cost because the Class has benefited enormously from their efforts, and because the amount of the awards is within the bounds of what courts around the country have approved in discrimination claims against their employer on behalf of their peers.

**A. The Class Representatives Spent Hundreds of Hours Actively Participating in the Litigation and Mediation for the Benefit of the Class**

From Randle's first intake call in 2017 and continuing to the present, the Class Representatives have invested hundreds of hours apiece over many years into prosecuting and settling this case. (Ex. 1, Randle Decl. ¶ 2; Ex. 2, Taylor Decl. ¶ 2; Ex. 3, Boyd Decl. ¶ 2; Ex. 4, Johnson Decl. ¶ 2.) Building up the class case required regular meetings with counsel—in person, by telephone, and by videoconference. (Randle Decl. ¶¶ 2, 14–15, 17; Taylor Decl. ¶¶ 2, 15–16, 17–18; Boyd Decl. ¶¶ 2, 12–14, 15–16; Johnson Decl. ¶¶ 2, 12–13.) At the outset of their engagement, the Class Representatives all had to describe their experiences many times to Class Counsel to teach Class Counsel about their claims from every angle. (Randle Decl. ¶ 14; Taylor Decl. ¶ 15; Boyd Decl. ¶¶ 12, 14); Johnson Decl. ¶ 13–14.)  The Class Representatives also had to furnish documents to Class Counsel to help Class Counsel identify nationwide patterns and practices of discrimination and policies that caused disparate impacts. (Randle Decl. ¶ 14; Taylor Decl. ¶ 15; Boyd Decl. ¶ 12; Johnson Decl. ¶ 11.) Moreover, Class Counsel required the Class Representatives' input on all strategic decisions. This required the Class Representatives not only to spend time speaking with Class Counsel, but also to teach themselves the legal and factual aspects of the case necessary to assist Class Counsel with strategy. (Randle Decl. ¶ 17; Taylor Decl. ¶ 18; Boyd Decl. ¶¶ 12, 14, 16; Johnson Decl. ¶ 16.)

Randle spent considerable time gathering and providing information regarding SunTrust's policies. (Randle Decl. ¶ 14.) Her advice was essential to help Class Counsel understand how SunTrust operates and the experience of African American FAs at SunTrust. (Bish Decl. ¶¶ 30, 33, 53–56.) Further, Randle was in regular contact with Class Members, listening to their stories and keeping them updated on the progress of the case. (Randle Decl. ¶¶ 12, 15, 22.) Randle and Boyd helped draft representative EEOC charges and all four Class

Representatives were actively consulted in the filing of the complaint and amended complaints. (Randle Decl. ¶ 14; Boyd Decl. ¶ 2.)

After Taylor contacted Class Counsel to discuss her experience at SunTrust, she spent many hours on the phone with Class Counsel and preparing written descriptions of her experience at the Firm. (Taylor Decl. ¶ 15.) She also spent hours reviewing documents and e-mails from her time at SunTrust. (*Id.*) Taylor participated in numerous calls over many hours with Class Counsel and the other Class Representatives. (*Id.* ¶¶ 2, 17–18.) She made herself available to Class Counsel to answer questions about her experience at SunTrust. (*Id.* ¶ 16.)

Boyd contacted Class Counsel shortly after leaving SunTrust. (Boyd Decl. ¶ 11.) Boyd spent many hours discussing his experience at SunTrust and his knowledge of the Firm. (*Id.* ¶¶ 12–14.) Boyd also played an important and active role in preparing his own representative EEOC charge of discrimination, his individual fact section in the amended complaint, as well as responding to Defendants' motion to dismiss. (*Id.* ¶ 13.) Boyd greatly assisted Class Counsel in developing the theory of the case and class allegations through his many hours spent with Class Counsel on calls, through e-mails, and through providing documentation and written narratives. (*Id.* ¶¶ 12–14.)

Johnson first reached out to Class Counsel while he was still employed at SunTrust. (Johnson Decl. ¶¶ 9–10.) Johnson took the additional risk of suing his current employer, risking retaliation and further damage to his career and reputation. (*Id.* ¶ 10.) Johnson spent many hours explaining to Class Counsel his experience, including providing written summaries and relevant documents. (*Id.* ¶ 11.) Johnson also actively participated in the amending of the complaint to add his individual claims of discrimination, as well as responding to Defendants' motion to dismiss. (*Id.* ¶ 12.) He was always responsive to Class Counsel's calls for additional information and

actively participated in group calls with Class Counsel and Class Representatives to discuss the status of the case and litigation strategy. (*Id.* ¶¶ 2,12–13,16.) The documents and knowledge shared by each Class Representative was critical to the success of this case. *Guippone v. BH S & B Holdings*, LLC, No. 09-cv-1029, 2011 WL 5148650, at *7 (S.D.N.Y. Oct. 28, 2011) (awarding service award and emphasizing that "[c]ourts recognize the important factual knowledge that named plaintiffs bring to employment class actions, including information about employer policies and practices that affect compensation").

The Class Representatives were also essential to the mediation. When Class Counsel and the Class Representatives agreed to mediate with Defendants, the Class Representatives' work kicked into high gear. To understand the data to make informed strategic decisions, the Class Representatives had to learn about statistical analysis and concepts like regression models, statistical significance, and standard deviations. (Randle Decl. ¶¶ 16–17; Taylor Decl. ¶¶ 17–18; Boyd Decl. ¶¶ 15–16; Johnson Decl. ¶ 16.) They were also required to learn about legal concepts surrounding class actions and employment discrimination. (Randle Decl. ¶ 17; Taylor Decl. ¶ 18; Boyd Decl. ¶ 16; Johnson Decl. ¶ 16.) Armed with this knowledge, the Class Representatives not only reviewed the statistical analyses and policy documents but participated in several meetings and conferences with Class Counsel in advance of each mediation. (Randle Decl. ¶¶ 16–17; Taylor Decl. ¶¶ 17–18; Boyd Decl. ¶¶ 15–16; Johnson Decl. ¶¶ 15–16.) The Class Representatives were also instrumental in developing potential programmatic relief to be proposed at mediation. (Randle Decl. ¶¶ 17, 19, 24; Taylor Decl. ¶¶ 18, 20, 24; Boyd Decl. ¶¶ 16, 18, 22; Johnson Decl. ¶¶ 18, 22.)

The Class Representatives also personally and actively participated in all four mediation sessions that spanned over two years. In June 2021, all four Class Representatives attended the

first all-day mediation sessions, which was conducted via video conference due to the COVID-19 pandemic, before Mr. Lewis. (Randle Decl. ¶ 16; Taylor Decl. ¶ 17; Boyd Decl. ¶ 15; Johnson Decl. ¶ 17.) All four spoke directly to Truist's executives and counsel and described their experience. (Randle Decl. ¶ 18; Taylor Decl. ¶ 19; Boyd Decl. ¶ 17; Johnson Decl. ¶ 17.) They also listened carefully to understand and consider the complex information presented by Truist and the mediators on behalf of the class. (Randle Decl. ¶ 18; Taylor Decl. ¶ 19; Boyd Decl. ¶ 17; Johnson Decl. ¶ 17.) As all four of the Class Representatives explain, recounting their experiences to Defendants' executives was particularly difficult and painful. (Randle Decl. ¶ 18; Taylor Decl. ¶ 19; Boyd Decl. ¶ 17; Johnson Decl. ¶¶ 2,17.) But as they acknowledge, it was essential for the Class Representatives to endure this vulnerability because the Defendants needed to hear directly from Black advisors regarding the issues African American FAs face on a daily basis. (Randle Decl. ¶ 18; Taylor Decl. ¶ 19; Boyd Decl. ¶ 17; Johnson Decl. ¶ 17.)

As further proof of their dedication to the Class Members, throughout the litigation, the Class Representatives met not only with Class Counsel but spoke with Class Members to keep them abreast of the litigation. (Randle Decl. ¶¶ 12, 15, 22; Taylor Decl. ¶¶ 13–14, 16; Boyd Decl. ¶ 14; Johnson Decl. ¶ 14.) As the public faces of this litigation, the Class Representatives spoke with absent Class Members to provide them with updates and guidance on the status of the litigation, as well as simply to hear their fellow FAs' stories. (Randle Decl. ¶¶ 12, 15, 22; Taylor Decl. ¶¶ 13–14, 16; Boyd Decl. ¶ 14; Johnson Decl. ¶ 14.)

The Class Representatives fought hard, every step of the way, for years, to extract as much as possible to compensate their fellow Class Members and ensure that current and future African American FAs do not endure the same experiences that they did. (Randle Decl. ¶ 19; Taylor Decl. ¶ 20; Boyd Decl. ¶ 18; Johnson Decl. ¶ 18.)

As financial advisors, the Class Representatives lost valuable networking and business-generation opportunities while devoting time and effort to this litigation. (Randle Decl. ¶¶ 2, 21; Taylor Decl. ¶¶ 2, 22; Boyd Decl. ¶¶ 2, 19; Johnson Decl. ¶ 19–20.) Further, by suing their current and former employer, Class Representatives have placed their careers in jeopardy. (Randle Decl. ¶ 23; Taylor Decl. ¶ 23; Boyd Decl. ¶ 21; Johnson Decl. ¶ 20.) The hundreds of hours they spent working on behalf of the Class Members represent hundreds of hours of lost business for the Class Representatives. (Randle Decl. ¶¶ 2, 21; Taylor Decl. ¶¶ 2, 22; Boyd Decl. ¶¶ 2, 19; Johnson Decl. ¶¶ 19–20.)

### B. The Class Representatives Publicly Associated Themselves with This Case at Great Personal Cost and Executed a Broader Release Than the Class Members

One of the most important steps the Class Representatives took to protect the interests of the class was filing this lawsuit in their names. While they labored for the rights of the entire class, they alone shouldered the burden of publicly accusing their employer of race discrimination on behalf of absent Class Members. These four Class Representatives' names will be publicly and persistently identified with this case. An internet or PACER search will reveal that association instantly. Prospective employers, who routinely conduct online searches of potential hires, might decide it is not worth the trouble to hire someone who has sued a former employer for race discrimination. (Bish Decl. ¶ 50.)

Indeed, Class Representatives Randle, Boyd, Taylor, and Johnson sacrificed professional reputations, career opportunities, relationships, and their emotional wellbeing to pursue claims on behalf of the Class. (Randle Decl. ¶¶ 2, 20–23; Taylor Decl. ¶¶ 2, 21–23; Boyd Decl. ¶¶ 2, 19–21; Johnson Decl. ¶¶ 19–21.)

Finally, to resolve this case, the Class Representatives obliged Defendants' request to sign a general release of all claims, rather than merely class claims. (*See* Settlement Agreement

§ V.B.; Exhibit 3 to the Settlement Agreement, Class Representative Release.) Class Members, on the other hand, release only class claims. (Settlement Agreement § V.A.) Service awards therefore help compensate the Class Representatives for sacrificing their individual claims for the sake of the class. *Velez v. Novartis Pharm. Corp.*, No. 04-cv-09194, 2010 WL 4877852, at *26 (S.D.N.Y. Nov. 30, 2010) (granting enhanced service awards because named plaintiffs released additional claims); *Curtis-Bauer v. Morgan Stanley & Co.*, No. 3:06-cv-3903, Dkts. 158 at 5–8, 250 at 19 (N.D. Cal. Feb. 7 & Oct. 22, 2008) (approving $25,000 service award plus $125,000 award for each class representative's general release).

### C.  The Class Benefited Significantly from The Class Representatives' Actions

The Class Representatives' rigorous efforts to protect the Class succeeded. The Class obtained a Settlement Fund of $14 million and programmatic relief designed to address the primary allegations at issue in this lawsuit and to level the playing field for African American FAs. This result is outstanding. Indeed, the $14 million Settlement Fund ranks within the top five largest employment discrimination settlements in each of the years 2018 to 2021.[2] Further, the $25,000 minimum award to Class Members alone would rank as the fourth largest per capita recovery for an employment discrimination settlement in 2021 and 2022.[3] And the Settlement Agreement creates an individualized Claims Resolution process for Class Members to receive an additional award based on their own individual facts and circumstances.

---

[2] *See, e.g.*, SEYFARTH, *18th Annual Workplace Class Action Litigation Report* at 33–34, https://bit.ly/3FtIQGq (fifth largest employment discrimination class settlement in 2021 was $14 million); SEYFARTH, *17th Annual Workplace Class Action Litigation Report* at 33–34, https://bit.ly/3QtvoY6 (fourth and fifth largest employment discrimination class settlement in 2020 was $14 million); SEYFARTH, *16th Annual Workplace Class Action Litigation Report* at 33–34, https://bit.ly/45KG4WW (fourth largest employment discrimination class settlement in 2019 was $14 million); SEYFARTH, *15th Annual Workplace Class Action Litigation Report* at 33–34, https://bit.ly/3QvPpNN (fifth largest employment discrimination class settlement in 2018 was $10 million).
[3] *See* SEYFARTH, *18th Annual Workplace Class Action Litigation Report* at 33–34, https://bit.ly/3FtIQGq; SEYFARTH, *17th Annual Workplace Class Action Litigation Report* at 33–34, https://bit.ly/3QtvoY6.

Due to the Class Representatives' assistance and firsthand insight shared with Class Counsel throughout the mediation process, Truist has agreed to take concrete actions to enhance opportunities for employment, earnings, and advancement of African American FAs. (Settlement Agreement § VII.) For the next two years, Truist will regularly compile demographic data and present it directly to its executive leadership. (*Id.* § VII.D.) Truist will also establish an FA Advisory Council to discuss issues of diversity, equity, and inclusion facing African American FAs (*Id*. § VII.E.) The FA Advisory Council provision commits Truist leadership, or its appointed representative, to meeting directly with the council to discuss issues facing African American FAs. (*Id.*) Further, Truist has committed to reviewing account distributions to ensure they are distributed according to the written policy and to reviewing the impact of the policy on African American FAs on an annual basis. (*Id.* § VII.G.) And Truist will consult with and obtain feedback from the FA Advisory Council regarding the account distribution policy. (*Id.*) Truist has also agreed to devise and implement a plan of good faith efforts to increase the number of African Americans in the candidate pools for FA positions. (*Id*. § VII.C.) In furtherance of this effort, as part of its regular performance evaluation of Wealth Brokerage managers, Truist will consider managers' involvement in Defendants' efforts to recruit diverse candidates for open FA positions, as well as their success in retaining diverse FAs. (*Id*. § VII.H.)

**D.  The Service Award Requested for Each Class Representative Is Reasonable and Within the Bounds of What Courts Have Awarded in Similar Employment Discrimination Class Actions**

Given the Class Representatives' actions, results, and efforts, a service award of $175,000 per Class Representative is reasonable. In many class actions, the named plaintiff is a figurehead who must prove that she received an unwanted phone call or purchased a defective product, which requires little effort and carries little stigma. *Cf.* T. Eisenberg & G. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 ULCA L. Rev. 1303, 1308

(2006) (interpreting higher incentive awards for class representatives in employment discrimination cases as due to "the high costs of their service to the class, including risks of stigmatization or retaliation on the job").

As one court explained, "[i]n discrimination-based litigation, the plaintiff is frequently a present or past employee whose present position or employment credentials or recommendation may be at risk by reason of having prosecuted the suit, who therefore lends his or her name and efforts to the prosecution of litigation at some personal peril." *Velez v. Novartis Pharms. Corp.*, No. 04-cv-09194, 2010 WL 4877852, at *25 (S.D.N.Y. Nov. 30, 2010) (quoting *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 201 (S.D.N.Y. 1997)); *see also Castillo v. Noodles & Co.*, No. 16-cv-03036, 2016 WL 7451626, at *2 (N.D. Ill. Dec. 23, 2016) (stressing the role of service awards to incentivize class representatives is "especially true in employment litigation"); *Tuten v. United Airlines, Inc.*, 41 F. Supp. 3d 1003, 1010 (D. Colo. 2014) (awarding service award that was nearly three times the per capita recovery in part because the class representative initiated a "suit against his long-time employer" demonstrating "the risk he took pursuing this litigation" (*see Tuten*, 12-cv-1567, Dkt. 52, for size of class, an estimated 1,200)); *Connolly v. Weight Watchers N. Am. Inc.*, No. 14-cv-01983, 2014 WL 3611143, at *4 (N.D. Cal. July 21, 2014) ("Representative Plaintiffs assumed the risk of being stigmatized or disfavored by their current or potential future employers by suing their employer."); *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 187 (W.D.N.Y. 2005) ("In employment litigation, the plaintiff is often a former or current employee of the defendant, and thus, by lending his name to the litigation, he has, for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers.").

To compensate for these risks, incentive awards in employment discrimination cases tend to be higher than in other types of class actions. *See, e.g.*, Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. REV. 1303, 1333, 1339 (2006) ("employment discrimination case class representatives bear unusually high costs"). And compared to other employment discrimination class actions, the requested service awards are well within approved awards. *See, e.g.*, *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (approving $300,000 service awards in race discrimination case). Indeed, in the last decade alone, courts have awarded to class representatives in employment discrimination cases similar or larger service awards than those agreed upon in the Settlement Agreement:

- $250,000 to each of 17 class representatives. Final Approval Order, *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 05-cv-6583, Dkt. 616 at 5 (N.D. Ill. Dec. 6, 2013).

- $250,000 to each of the four class representatives. *Chen-Oster v. Goldman Sachs & Co.*, No. 10-cv-6950, 2023 WL 7325264, at *3 (S.D.N.Y. Nov. 7, 2023).

- $175,000 to each of six class representatives. Final Approval Order, *Slaughter v. Wells Fargo Advisors, LLC*, No. 13-cv-06368, Dkt. 113 at 5 (N.D. Ill. May 4, 2017).

- $150,000 to each of six class representatives. Final Approval Order, *Senegal v. JPMorgan Chase Bank, N.A.*, No. 18-cv-6006, Dkt. 40 at 5 (N.D. Ill. Dec. 20, 2018), *aff'd*, 939 F.3d 878 (7th Cir. 2019).

- $150,000 to each of three class representatives. Final Approval Order at 5, *Bland v. Edward D. Jones & Co.*, No. 18-cv-3673, Dkt. 139 (N.D. Il. July 1, 2021).

Moreover, although service awards are important to reward the Class Representatives' efforts and encourage future employees to take the risk of filing class employment discrimination suits, they will minimally impact the Class Members' recovery. Because Class Representatives have obtained such a significant Settlement Fund for the Class, the aggregate requested service awards of $700,000 represents only 5% of the Settlement Fund, on par with or lower than courts

in this district and around the country have approved in other cases employment cases. *See, e.g.*, *Roberts v. Baptist Healthcare Sys., LLC*, No. 1:20-cv-00092, 2023 WL 5163374 (E.D. Tex. June 29, 2023), *report and recommendation adopted*, No. 1:20-cv-0092, 2023 WL 4678545 (E.D. Tex. July 21, 2023) (approving service awards representing 9.4% of the common fund); *Hyun v. Ippudo USA Holdings*, No. 14-cv-8706, 2016 WL 1222347, at \*2 (S.D.N.Y. Mar. 24, 2016) (finding that aggregate service awards of more than 5% of the settlement fund and was "well within the range for employment discrimination cases") (citing *Mills v. Capital One, N.A.*, No. 14-cv-1937, 2015 WL 5730008, at \*18 (S.D.N.Y. Sept. 30, 2015)); *Senegal v. JPMorgan Chase Bank, N.A.*, No. 18-cv-6006, Dkt. 40 at 5 (N.D. Ill. Dec. 20, 2018), *aff'd*, 939 F.3d 878 (7th Cir. 2019) (approving $900,000 aggregate service award, representing 4.6% of the settlement fund).

## II.    The Attorneys' Fees and Costs Sought by Class Counsel Are Reasonable in Light of the Work Invested and Settlement Achieved for the Class

Attorneys who represent a class and achieve a common fund benefit for class members are entitled to a reasonable fee as compensation for their services. As the Supreme Court recognized, "a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also Hartman v. Pompeo*, No. 77-cv-2019, 2020 WL 6445873, at \*6 (D.D.C. Nov. 3, 2020) ("[F]air and just allowances for expenses and counsel fees should be spread among all the beneficiaries of the fund." (internal quotations omitted)). As such, the common fund doctrine allows an "attorney whose efforts created, increased or preserved a fund 'to recover from the fund the costs of his litigation, including attorneys' fees.'" *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 88 (D.D.C. 2013) (*quoting In re Baan Co. Sec. Litig.*, 288 F. Supp. 2d 14, 16 (D.D.C. 2003)). The Requested Fees Are Plainly Reasonable Under This Circuit's Percentage-of-Fund Approach

The court-approved Notice advised Class Members that Class Counsel would seek attorneys' fees of not more than 25% of the Settlement Fund, plus reimbursement of reasonable litigation expenses. No Class Member objected or even questioned this agreement. The 25% rate is lower than the 33⅓% contract rate that the Class Representatives negotiated and agreed to at the onset of the case, and is lower than awards granted by other courts in this district in employment cases that result in common funds. *See, e.g.*, *Meyer v. Panera Bread Co.*, No. 17-cv-2565, 2019 WL 11271381, at *9 (D.D.C. Mar. 6, 2019), *report and recommendation adopted sub nom. Meyer v. Panera, LLC*, No. 17-cv-2565, 2019 WL 11271378 (D.D.C. Mar. 29, 2019) (approving 33.48% of common fund for attorneys' fees); *Kosen v. American Express Financial Advisors, Inc.*, No. 02-cv-0082, (D.D.C. June 16, 2002), ECF No. 15 (awarding class counsel a 35% of fund for fees and costs in employment discrimination class action that settled before discovery).

Class Counsel's commitment of time and resources will continue well after final approval. Unlike many other common-fund settlements, monetary awards to the Class will not be computed solely by rigid formula. Instead, Settlement Class Members will file a Claim Form and participate in a nuanced and detailed Claims Resolution Process through which they will receive an individualized assessment of their claims, including a hearing with a Neutral, if requested. (Dkt. 56-1, Settlement Agreement (hereinafter "Agreement"), § IX.C.) To support this process, Class Counsel will devote significant staff and attorney time to facilitate the training of the Neutrals and assist Class Members through process, including answering their questions about the claim form, preparing them for their individual hearings, and finally attending individual hearings with Class Members.  Class Counsel is committed to assisting Class Members

throughout the Claims Resolution Process no matter how many requests for help, which will result in substantial additional legal and administrative work. (Bish Decl., ¶¶ 66–67.)

Therefore, and for the reasons described further below, Class Counsel respectfully requests an award of attorneys' fees of 25% of the Settlement Fund-and reimbursement of reasonable costs incurred in prosecuting this case to a successful resolution.

The D.C. Circuit applies "a percentage-of-the-fund method" in "determining the attorney fees award in common fund cases" like this case. *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993); *Radosti v. Envision EMI, LLC*, 760 F. Supp. 2d 73, 77 (D.D.C. 2011) ("[I]n class action cases in which the plaintiff class recovers benefits from a common fund, the favored method of calculating attorneys' fees is to award a percentage of the fund."); *In re Vitamins Antitrust Litig.*, No. MDL 1285, 2001 WL 34312839, at *2 (D.D.C. July 16, 2001) ("[T]his Circuit requires the percentage of recovery method in common fund cases"). The percentage-of-the-fund method "helps to align more closely the interests of the attorneys with the interests of the parties," *Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*, 3 F.3d 1568, 1573 (D.C. Cir. 1993), and is "less demanding of scarce judicial resources" than the lodestar method, *Swedish Hosp. Corp.*, 1 F.3d at 1269 ("It is much easier to calculate a percentage-of-the-fund fee than to review hourly billing practices over a long, complex litigation."); *see also Hubbard v. Donahoe*, 958 F. Supp. 2d 116, 124 (D.D.C. 2013) ("In the common fund context, the percentage of recovery method does a better job of guarding against potential abuses than the lodestar method.").

Courts in this Circuit "have often considered the following seven factors," in determining whether to grant a motion for attorneys' fees in common fund cases: "(1) 'the size of the fund created and the number of persons benefited'; (2) 'the presence or absence of substantial

objections by class members to the settlement terms or fees requested by counsel'; (3) 'the skill and efficiency of the attorneys involved'; (4) 'the complexity and duration of litigation'; (5) 'the risk of nonpayment'; (6) 'the time devoted to the case by plaintiffs' counsel'; and (7) 'awards in similar cases." *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d 94, 110 (D.D.C. 2013). Here, each of these factors warrants granting Class Counsel attorneys' fees.

### E.  The Size of the Fund and Per Capita Recovery Justifies the Fee Request

Class Counsel achieved a $14 million Settlement Fund with a guaranteed minimum $25,000 award to every Class Member, with an individualized claims resolution process through which Class Members may receive more. This outstanding result weighs strongly in favor of granting the requested fees. If approved, the $14 million common fund ranks consistently among the top five employment discrimination class action recoveries in each of the past four years. The $25,000 minimum award to Class Members will rank as the fourth largest per capita recovery for an employment discrimination settlement in 2021 and 2022. (*See supra*, note 3).

Indeed, the Class Members' per capita recovery dwarfs those of similar funds from which courts in this District have approved equal or greater fee awards. *See Little v. Washington Metro. Area Transit Auth.*, 313 F. Supp. 3d 27, 39 (D.D.C. 2018) (granting 25% fee award in race discrimination case for a fund of $6.5 million and post–attorneys' fees per capita distributions of roughly $1600—roughly 1/30th of this settlement); *Wells v. Allstate Ins. Co.*, 557 F. Supp. 2d 1, 6, 7 (D.D.C. 2008) (finding that the size of fund and class weighed in favor of 45% fee award where remaining settlement amount of $800,000 would be shared among 1,191 class members at $671.70 per capita—roughly 1/80th of this settlement—because "each class member will receive significant value from this settlement"). Thus, the size of the fund and number of persons

benefited warrants Class Counsel's requested fee. The Lack of Class Member Objections

Supports Approval of the Fee Request.

> **1.    The Lack of Objections by Class Members Further Weighs in Favor of Awarding Class Counsel's Requested Fees**

The Notice specifically informed Class Members that Class Counsel would seek

attorneys' fees of not more than 25% of the Settlement Fund, plus reimbursement of reasonable

litigation expenses. (Ex. 1 to Settlement Agreement, Dkt. 56–1; Bish Decl. ¶ 68.) The notice

further explained that these fees and expenses, if awarded by the Court, would be paid from the

Settlement Fund. (Dkt. 56–1.) All Class Members appear to have received the notices, and the

objection period closed on December 26, 2023. To date, no class member has filed an objection

to the settlement terms or to the requested attorneys' fees, indicating their reasonableness and

class approval. *See Kifafi v. Hilton Hotels Ret. Plan*, 999 F. Supp. 2d 88, 101 (D.D.C. 2013)

(awarding fees in a common fund case when very few class members objected to the fee award).

> **2.    Experienced Class Counsel Litigated a Complex and Lengthy Case with Skill and Efficiency**

Experienced Class Counsel successfully litigated this complex case with skill and

efficiency, more than justifying a 25% fee award. Rather than engage costly discovery and

motion practice that would have burdened the Court, Class Counsel utilized its knowledge of the

wealth management industry and law, and of SunTrust's own practices, to attain cooperatively

from Defendants through the mediation process a large body of information essential to get to

the key issues of the case. Through experience and hard work, they analyzed complex data and

facts to engage in successful negotiations that avoided further delay and risk to the class and

preserved judicial resources.

Though prosecuting discrimination class actions is challenging, Class Counsel's long

history of achievement has resulted in important settlements in discrimination class actions, such

as the seminal, post-*Walmart* settlement on behalf of 1,400 Black financial advisors *McReynolds v. Merrill Lynch. See also Martens v. Smith Barney, Inc.*, No. 96-cv-3779 (S.D.N.Y.) (multimillion dollar recovery for female financial advisors); *Cremin v. Merrill Lynch,* No. 96-cv-3773 (N.D. Ill.) (multi-million-dollar recovery for female financial advisors) (Bish Decl. (multi-million-dollar recovery for female financial advisors) (Bish Decl. ¶¶ 10–12.) *See also Slaughter v. Wells Fargo*, No. 13-cv-6368 (N.D. Ill.), *Creighton v. Metlife*, No. 15-cv-8321 (S.D.N.Y.), *Senegal v. JPMorgan Chase Bank*, N.A., No. 18-cv-6006 (N.D. Ill.), and *Bland v. Edward Jones*, No. 18-cv-3673 (N.D. Ill.). (*Id.* ¶ 13).

These results have not been easy but were attained through commitment to clients regardless of the challenges or duration of the case. For example, in *McReynolds v. Merrill Lynch*, the case settled granting significant financial and injunctive relief for 1,400 financial advisors only after almost a decade of litigation, including proceedings before the District Court, Seventh Circuit Court of Appeals, and two petitions for certiorari to the United States Supreme Court. (*Id.* ¶ 11).

### 3. This Case Was Lengthy and Complex

Employment discrimination class actions are complex and often lengthy, and Class Counsel leveraged the skill and experience developed from these past cases to effectively litigate this one for over six 6 years. *See Howard v. Liquidity Servs. Inc.*, No. 14-cv-1183, 2018 WL 4853898, at *7 (D.D.C. Oct. 5, 2018) (finding that class counsel's "extensive experience handling complex class actions such as this one" weighed in favor of awarding a 25% fee award). Beginning in 2017, Class Counsel worked alongside Class Representatives to investigate the Defendants' pattern and practice of discrimination. After filing Plaintiff Randle's representative charge of discrimination with the EEOC and obtaining a right to sue, Plaintiffs Randle and Taylor filed their initial complaint in this Court, which was later amended to add

Plaintiffs Boyd and Johnson. Defendants moved to dismiss all of the Class Representatives individual and class claims. After extensive briefing, including over 90 pages of memoranda and supplemental submissions, the Court denied Defendants' motion in its entirety.

Shortly after the Court denied Defendants' motion to dismiss, the parties agreed to engage in private mediation. The parties then engaged in over two years of contentious and arms-length settlement negotiations with the assistance of a highly experienced mediator, Michael K. Lewis. Before Class Counsel and Class Representatives agreed to mediate, they demanded Defendants produce substantial discovery of the kind that Plaintiffs would have obtained in formal discovery, including Defendants' policies and practices and the workforce, HR, compensation, and account data necessary to assess the class claims and damages. (Bish Decl. ¶ 28) Class Counsel, who have extensive experience litigating employment discrimination in the financial sector and thus are familiar with such policies and datasets, reviewed the documents and data in detail and also retained an expert labor economist and statistician to review and analyze the workforce and client account data. (*Id.* ¶ 29.) *see Kifafi*, 999 F. Supp. 2d at 102 (D.D.C. 2013) (weighing the extensive discovery obtained by class counsel in favor of awarding approximately $21 million in fees in common fund case); *Kosen v. American Express Financial Advisors, Inc.*, No. 02-cv-0082, (D.D.C. June 16, 2002), ECF No. 15 (awarding class counsel a 35% of fund for fees and costs in employment discrimination class action that settled before discovery in part because of the factual and legal complexity involved in identifying policies that caused class-wide discrimination). Marshalling evidence for the class claims required shifting through substantial discovery produced by Defendants, extracting and analyzing years' worth of workforce data, and working closely with Class Representatives and Class Members to learn about their experiences.

Settlement negotiations in this case we particularly protracted and contentious. After two all-day mediations, the parties reached an impasse. In an effort to revive settlement negotiations, counsel for the parties agreed to hold several in-person sessions with Mr. Lewis present to discuss their competing theories of damages. Counsel for both parties made lengthy presentations about their analysis of the data and their theory on damages. On at least one occasion, the parties' respective experts attended to facilitate discussions on damages analyses. Ultimately, counsel met four times in person, which led the parties to agree to resume formal mediation sessions with two in-person all-day mediation session in Washington, D.C.

Ultimately, Class Counsel's and Class Representatives' tenacity and hard work paid off. After over six years of litigation and two years of negotiations with the help of experienced mediator, Class Counsel and Class Representatives negotiated outstanding monetary and programmatic relief for the class. Absent the Settlement Agreement, Class Members would face a lengthy discovery process, class certification fight, a potential Rule 23(f) appeal, Daubert motions, a motion for summary judgment, and more years of litigation before any Class Member could potentially recover on his or her claim. (Bish Decl. ¶ 21.) An analysis of this case's complexities and duration strongly supports the requested fee. *See Little*, 313 F. Supp. 3d at 39 (finding fact that the case had "already lasted approximately four years and, due to its complexity, was destined to continue for additional years before a final resolution" weighed in favor of granting 25% fee award).

### 4.    Class Counsel Devoted Significant Time and Resources While Risking Nonpayment

Class Counsel agreed to represent the Class Representatives in 2017 on a one-third contingency-fee basis, assuming a significant risk that the Class Members would recover nothing, and Class Counsel might never be paid or reimbursed for expenses. (Bish Decl. ¶ 19–

21.) In the face of this risk, Class Counsel invested an enormous amount of time in litigating this case. (*Id.*, ¶ 19.) Class Counsel chose to devote time to this case rather than others. Further, Class Counsel will continue to dedicate time to this case throughout the claims resolution process, assisting Settlement Class Members by answering questions, advising them of their rights and options, and helping them complete and submit Claim Forms if requested. (*Id.*, ¶¶ 66–69.)

The risk of nonpayment is particularly acute in employment discrimination cases, which generally fare poorly in the courts and are at substantial risk of dismissal through dispositive motions. (*Id.*, ¶ 19–21); *see Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 696 (N.D. Ga. 2001) ("Historically, claims alleging systemic employment discrimination are difficult to win."); Hon. Denny Chin, *Summary Judgment in Employment Discrimination Case: A Judge's Perspective*, 57 N.Y.L Sch. L. Rev. 671, 672–73 (2013) (summary judgment is granted, in whole or in part, in employment discrimination cases approximately 77% percent of the time, a higher rate than other types of civil cases); *accord* Memorandum from Joe Cecil & George Cort, Fed. Judicial Ctr., to Judge Baylson, at 3 (Aug. 13, 2008), available at https://bit.ly/474x1km (in employment discrimination cases in federal court, summary judgment motions by defendants are more common, more likely to be granted, and more likely to terminate the litigation than other case types).

Class certification presents another risk, as even before the Supreme Court decided *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), nationwide employment discrimination class actions were challenging. Even if the class were certified, as Class Counsel believes would occur, Defendants likely would pursue an interlocutory appeal, requests for which are often successful, adding years to the litigation and adding the risk of decertification. *See Barry Sullivan & Amy K. Trueblood*, Rule 23(f): A Note on Law and Discretion in the Courts of

Appeals, 246 F.R.D. 277, 286 n.43, 290–91 (2008) (finding that "regardless of whether the defendants or plaintiffs filed the appeal, the outcome was favorable to defendants about 70% of the time"). And even if class certification were upheld on appeal, the matter would have required liability discovery, Daubert and summary judgment motions, and a class-wide jury trial on liability. (Bish Decl. ¶ 49.) Each of those steps carries a risk of loss and therefore the risk of nonpayment.

More than just investing time, Class Counsel invested substantial resources without any assurance it could recover its out-of-pocket costs, including retaining an expert labor economist and engaging a respected mediator. The extensive time and resources Class Counsel devoted to this case, coupled with the very real risk of nonpayment, justifies the requested 25% fee award. *See Little*, 313 F. Supp. 3d at 38–39 (awarding a 25% fee when counsel "devoted significant time, more than they will ultimately be compensated for, and at all times faced a significant risk of nonpayment if the claims were not ultimately successful"); *Howard*, 2018 WL 4853898, at *8 (finding that risk of nonpayment supported a 25% fee award when counsel undertook the case "on an entirely contingent fee basis, assuming a substantial risk that the litigation would yield no or potentially little recovery") (internal quotation omitted)).

### 5.    The Requested Fee Award is Lower Than Awards in Similar Cases

Finally, a 25% fee award is well within the range of awards in similar cases, and on par with or lower than the fee awarded in other employment discrimination cases. In general, fee awards in common fund cases may range up to 45% of the fund. *Little*, 313 F. Supp. 3d at 35 (quoting *Wells v. Allstate Ins. Co.*, 557 F.Supp.2d 1, 6 (D.D.C. 2008)). In employment litigation and other civil rights cases, fees awarded tend to be over 30%. *See*, *e.g., Meyer v. Panera Bread Co.*, No. 17-cv-2565, 2019 WL 11271381, at *9, 12 (D.D.C. Mar. 6, 2019), *report and recommendation adopted sub nom. Meyer v. Panera, LLC*, No. 17-cv-2565, 2019 WL 11271378

(D.D.C. Mar. 29, 2019) (approving 33.48% of common fund for attorneys' fees); *Bynum v. D.C.*, 412 F. Supp. 2d 73, 81 (D.D.C. 2006) (approving 33.3% of common fund for attorneys' fees); *Kosen v. American Express Financial Advisors, Inc.*, No. 02-cv-0082, (D.D.C. June 16, 2002), ECF No. 15 (awarding class counsel a 35% of fund for fees and costs in employment discrimination class action that settled before discovery).

This circuit adopted the "percentage-of-the-fund methodology" in part because it "more closely reflects the marketplace," *Swedish Hosp. Corp.*, 1 F.3d at 1270, and a few courts in this Circuit have also considered the requested fee award in light of the award "that would otherwise prevail in the market," *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *12. Here, the marketplace dictated a 33⅓% contingency rate fee—the rate Class Representatives negotiated and agreed to pay. (Bish Decl. ¶¶ 15, 22, 24.) Thus, a 25% award provides Class Members a discount, and is less than Class Members would pay individually on the open market. Finally, this district does not require a lodestar cross check, although Class Counsel has invested over six years of time into the case. *See, e.g., Little*, 313 F. Supp. 3d at 34, 38-39 (awarding attorneys' fees without conducting a lodestar crosscheck); *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 101 (D.D.C. 2013) ("In this circuit, such a lodestar cross-check is not required.").

### 6.   The Costs Requested by Class Counsel Are Reasonable and Were Necessarily Incurred to Achieve the Benefit Obtained

"In addition to being entitled to reasonable attorneys' fees, '[c]lass counsel in common fund cases is also entitled to reasonable litigation expenses from that fund.'" *In re Lorazepam & Clorazepate Antitrust Litig.*, 2003 WL 22037741, at *10 (alteration in original) (*quoting In re First Databank Antitrust Litig.*, 209 F. Supp. 2d 96, 98 n.4 (D.D.C. 2002)). In reimbursing costs, courts consider whether the costs are related to expenses that benefited the class and that counsel would typically bill clients. *In re Vitamins Antitrust Litig.*, No. MDL 1285, 2001 WL 34312839,

at *13 (D.D.C. July 16, 2001). Class Counsel incurred $91,232.21 in costs. (Exhibit 2, Robot Decl., ¶ 4.) These expenses were reasonable and necessary to prosecute the claims and achieve the Settlement Agreement

Expert costs constitute nearly 20% of Class Counsel's expenses. (*Id.*) The expert's analyses and resulting reports were key in reaching the Settlement Agreement. Class Counsel and Class Representatives agreed to mediation only after Defendants produced substantial discovery necessary to assess their claims and damages. Class Counsel retained an expert labor economist to thoroughly review and analyze the data produced by Defendants and conducted extensive studies and analyses regrading issues of liability and damages that informed the Class Representatives' and Class Counsel's mediation positions and negotiations. (Bish Decl. ¶¶ 29, 33.) These expert costs clearly benefited the class and should be reimbursed. *See In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig*., 4 F. Supp. 3d 94, 113 (D.D.C. 2013) (reimbursing class counsel $10,027,188.94 in expert costs). The class was likewise benefited by the four many mediation sessions overseen and countless informal individual meetings and conference calls conducted overseen by experienced mediator Michael K. Lewis over the course of more than 2 years. It is doubtful that the parties would have reached a Settlement Agreement absent these sessions. (Bish Decl. ¶¶ 31–35.) Mediation expenses totaled $41,867 or approximately 45% of Class Counsel's expenses and should be reimbursed as necessary costs. (Robot Decl., ¶ 4.) The remainder of the costs relate to common litigation expenses such as travel and computerized research, all of which are routinely reimbursed. *See, e.g., Howard*, 2018 WL 4853898, at *8 (reimbursing class counsel for requested costs, "including costs for travel, consulting experts, and conducting mediation, as well as for costs related to deposition transcripts and computerized research").

## **CONCLUSION**

Class Counsel respectfully requests that the Court award Service Awards of $175,000 for each of the Class Representatives and award Class Counsel 25% of the Settlement Fund, or $3,500,000, in attorneys' fees and $91,232.21 in costs.

Dated: January 12, 2024

Respectfully submitted,
**STOWELL & FRIEDMAN, LTD.**

By:___*/s/ Suzanne E. Bish*_____
      Linda D. Friedman (pro hac vice)
      Suzanne E. Bish (pro hac vice)
      George S. Robot
      Stowell & Friedman
      303 W. Madison St., Ste. 2600
      Chicago, IL 60606
      Telephone: (312) 431-0888
      lfriedman@sfltd.com
      sbish@sfltd.com
      grobot@slftd.com