**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

TRACY RANDLE et al.,

　　　　　　*Plaintiffs*,

　　v.

SUNTRUST BANK, INC. et al.,

　　　　　　*Defendants*.

Civil Action No. 18-1525 (TJK)

**<u>MEMORANDUM OPINION</u>**

Four named plaintiffs sue on behalf of a class of African American financial advisors employed by Defendants, which the Court refers to collectively as SunTrust. They allege that SunTrust assigned them to bank branches with fewer opportunities to develop business and denied them the chance to work on lucrative client accounts because of their race. The parties reached a settlement resolving all claims, which the Court preliminarily approved. Now Plaintiffs, with no opposition, move for class certification, final approval of the class action settlement, service awards to class representatives, and attorney's fees and costs. For the reasons explained below, the Court will grant their motions.

I.　　**Background**

　　A.　　**Factual and Procedural Background**

Plaintiffs Tracy Randle, Allison Taylor, Arthur Boyd, and Tahir Johnson are former financial advisors for SunTrust. In their operative complaint, they allege that SunTrust maintains company-wide discriminatory policies governing "compensation, teaming, and the assignment of territory, resources, designations and business opportunities," ECF No. 16 ("Am. Comp.") ¶ 15, "that result in higher rates of attrition and lower pay for African Americans and that segregate the

SunTrust workforce by race," *id.* ¶ 3.  More specifically, according to Plaintiffs, SunTrust "'race matches' and assigns African American [financial advisors] to branches with higher African American and minority populations," while "[w]hite [financial advisors] are assigned to wealthier, and often 'whiter,' territories with greater opportunities." *Id.* ¶ 18.  African-American financial advisors are purportedly "assigned branches with no or fewer licensed bankers . . . [and] are also often assigned to multiple, smaller branches, diluting their time and resources, and limiting the [financial advisors'] ability to form consistent, productive relationships with lead-generating bankers and clients." *Id.* ¶ 19.  And the complaint alleges that African-American financial advisors "are disproportionately excluded" from assignments to "Premier Banks," which "are largely in affluent areas and are disproportionately absent from predominantly African American communities, to which African American [financial advisors] are steered by SunTrust." *Id.* ¶¶ 20–21.  And African-American financial advisors are "almost entirely excluded" from title designations needed to serve "high net worth clients" and from "favorable teams and pools" that can increase compensation. *Id.* ¶¶ 22–23.

Plaintiffs bring the following claims: (1) class-wide racial discrimination in violation of 42 U.S.C. § 1981 and 42 U.S.C. § 2000e *et seq.*; (2) individual retaliation in violation of 42 U.S.C. § 1981 as to Randle and Boyd; and (3) individual retaliation in violation of 42 U.S.C. § 2000e *et seq.* as to Randle.  Am. Compl.; *see also* ECF Nos. 1, 15.

The Court denied SunTrust's motion to dismiss and granted the parties a stay to engage in settlement negotiations.  At that point, the parties exchanged "substantial discovery, including documents reflecting and related to the policies and practices challenged by the lawsuit and the employment workforce, human resources, compensation, and account data necessary to assess their claims and damages."  ECF No. 56 at 4.  Plaintiffs also retained experts to analyze that data.

*Id.* Mediation lasted more than two years and led to the proposed settlement agreement now before the Court. *Id.* at 4–5.

In August 2023, the parties sought provisional class certification, preliminary approval of a class action settlement, and approval and distribution of notice to the class of the settlement. ECF No. 56. The Court granted that motion, conditionally certifying the class and provisionally finding that the proposed settlement was "fair, reasonable, adequate, and the result of extensive, arm's length negotiation between experienced counsel and Parties." ECF No. 59 at 2–3. The Court also approved notice to the class and appointed a neutral arbiter and claims administrator. *Id.* at 4. Following the Court's preliminary approval, the claims administrator mailed notices to all members of the class and established a website describing the settlement and providing access to all key documents. ECF No. 62-3 at 3–4. For each notice returned undeliverable, notice was remailed to an updated address. *Id.* at 3. No class members objected to or opted out of the settlement. *Id.* at 4; *see* Feb. 1, 2024 Hr'g Tr. at 18:7–15. Plaintiffs, without opposition, now move for class certification, final approval of the class action settlement, service awards to class representatives, and attorney's fees and costs. ECF Nos. 62, 63. The Court held a fairness hearing on February 1, 2024.

### B.    Proposed Settlement Agreement

The terms of the proposed class action settlement, which remain the same since the Court preliminarily approved it, are summarized below.

#### 1.    Putative Class

For purposes of the settlement, the putative class is "[a]ll individuals who were employed by SunTrust Investment Services as a Financial Advisor" as defined by the settlement agreement "at any time between June 24, 2014 and February 17, 2021, and who self-identified to

[SunTrust] as African American and/or Black, as reflected in Defendants' workforce data, which was used to develop the class list provided by Defendants to Class Counsel."  ECF No. 62-2 at 4.

### 2.  Programmatic Relief

The settlement provides for programmatic relief designed to enhance opportunities for employment, earnings, and advancement of African-American financial advisors over a two-year period.  ECF No. 56-1 at 30.  That relief has three core components.  The first is an advisory council, which will meet on a biannual basis "to discuss issues of diversity, equity, and inclusion" facing those employees.  *Id.* at 30–31.  The parties represent that the advisory council will seek to address SunTrust's account distribution policy, a key issue in this litigation.  ECF No. 62 at 10.  The second part is SunTrust's plan to increase African-American financial advisor representation and retention in those positions, largely focused on tracking appropriate data to assess the effectiveness of the bank's efforts.  ECF No. 56-1 at 30–32.  Finally, SunTrust will maintain procedures for financial advisors to communicate interest in working at particular branches when openings become available, and to ensure that accounts of financial advisors who leave SunTrust are distributed in accord with SunTrust's written policy and with its ongoing review of the effect of that policy on African-American financial advisors.  *Id.* at 31.

### 3.  Settlement Fund and Claims Resolution Process

Along with the programmatic relief explained above, the settlement provides for a fund of $14 million.  ECF No. 56-1 at 32.  That fund is intended to compensate Plaintiffs (both named and class); provide for attorney's fees, costs, and service awards; and cover income taxes and costs of administering the settlement.  *Id.* at 32–33.  Plaintiffs seek $175,000 service awards for class representatives and attorney's fees of 25% of the settlement fund.  ECF No. 63 at 17, 21.  Funds will be distributed by individualized assessment of class members' claims by the neutral arbiter, who

is tasked with weighing certain factors prescribed by the parties' agreement.  ECF No. 56-1 at 34–40.  As part of that assessment, class members will have to submit a detailed claim form and may attend an hour-long session with the arbiter to discuss aspects of their claims.  *Id.*  Each class member who submits a timely claim will receive a minimum award of $25,000.  *Id.* at 35.

## II.     Class Certification

### A.      Legal Standard

Parties seeking class certification, even for settlement purposes only, must show that they meet the prerequisites of Rule 23(a) and fall within at least one of the categories described in Rule 23(b).  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–14 (1997); *see also Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 191–92 (D.D.C. 2011) ("*Trombley II*").  A class certified for "settlement purposes only" requires "closer judicial scrutiny" than settlements reached after class certification, given that "meaningful judicial review" may be "more difficult and more important."  *Trombley II*, 826 F. Supp. 2d at 191 (citations omitted).  But Courts need not consider whether "the case, if tried, would present intractable management problems."  *Thomas v. Albright*, 139 F.3d 227, 234 (D.C. Cir. 1998) (quoting *Amchem*, 521 U.S. at 591).

### B.      Analysis

The Court will first consider the requirements of Rule 23(a), before turning to part (b).  As explained below, the Court finds that the class meets those requirements for certification.

#### 1.      Rule 23(a)

"Rule 23(a) states four threshold requirements applicable to all class actions: (1) numerosity (a 'class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical . . . of the class'); and (4) adequacy of representation (representatives 'will fairly and

adequately protect the interests of the class')."  *Amchem*, 521 U.S. at 613 (alteration in original) (quoting Fed. R. Civ. P. 23(a)).  All are satisfied.

### a.    Numerosity

"[C]ourts in this jurisdiction have observed that a class of at least forty members is sufficiently large to meet [the numerosity] requirement," though "[t]here is no specific threshold that must be surpassed" to satisfy it.  *Taylor v. D.C. Water & Sewer Auth.*, 241 F.R.D. 33, 37 (D.D.C. 2007).  Class sizes shy of 40 members may find themselves in "numerosity's gray area—where joinder is neither presumptively impracticable nor presumptively practical."  *Coleman ex rel. Bunn v. District of Columbia*, 306 F.R.D. 68, 80 (D.D.C. 2015) (certifying class of 34 potential members).  Courts then consider "(1) 'judicial economy arising from avoidance of a multiplicity of actions'; (2) 'geographic dispersion of class members'; (3) 'size of individual claims'; (4) 'financial resources of class members'; and (5) 'the ability of claimants to institute individual suits.'"  *Id.* (citation omitted).

The proposed settlement class comprises 37 members: "all individuals who were employed by [SunTrust Investment Services, Inc.] as a Financial Advisor at any time between June 24, 2014 and February 17, 2021, and who self-identified to [SunTrust Investment Services, Inc.] as African American and/or Black, as reflected in Defendants' workforce data, which was used to develop the class list provided by Defendants to Class Counsel."  ECF No. 56-1 at 18.  Thus, Plaintiffs "find themselves at the high end of numerosity's gray area."  *See Coleman*, 306 F.R.D. at 80.

The size of the proposed class notwithstanding, joinder would be impracticable here.  Because SunTrust operates nationwide, class members are geographically dispersed across the country.  *See* ECF No. 56 at 7–8.  Some, too, are current employees who may be unable or unwilling to personally appear in a suit against their employer.  *Id.*  And significant judicial economies are

gained by resolving claims against SunTrust for the same company-wide policies in one case. *See Coleman*, 306 F.R.D. at 80. To be sure, cutting against certification are the sizeable claims and, in some cases, the financial resources of class members that make the prospect of joinder more plausible, along with the relative ease of identifying class members. *See Frazier v. Consol. Rail Corp.*, 851 F.2d 1447, 1456 (D.C. Cir. 1988). But "the mere existence of 'large claims will not defeat certification when other factors'—in particular the 'cardinal interests of judicial economy and conservation of time and financial resources'—'overwhelmingly indicate that a class action is the superior method for adjudicating the controversy.'" *Burks v. Islamic Republic of Iran*, No. 16-cv-1102 (CRC), 2023 WL 4838382, at *3 (D.D.C. July 28, 2023) (citation omitted). So too here. Given the considerable judicial economies of settling these claims, which would likely be prohibitively difficult and expensive to litigate individually, the Court finds that the class satisfies the numerosity requirement of Rule 23(a)(1).

### b.   Commonality

Commonality is satisfied when "there is at least one issue, the resolution of which will affect all or a significant number of putative class members." *Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*, 246 F.R.D. 349, 357 (D.D.C. 2007). "[F]actual variations among class members will not defeat the commonality requirement, so long as a single aspect or feature of the claim is common to all proposed class members." *Bynum v. District of Columbia*, 214 F.R.D. 27, 33 (D.D.C. 2003). The parties argue that class members' claims share multiple questions of law and fact, given that "the class members are all financial advisors working for the same firm challenging the same firm-wide policies and practices as discriminatory under the same legal theories." ECF No. 56 at 8. The Court agrees. And where a class consists of employees holding the same position and who "were subject to the same work policies and practices underlying this lawsuit,"

"[t]hat is more than sufficient to meet the commonality requirement." *Stephens v. Farmers Rest. Grp.*, 329 F.R.D. 476, 483 (D.D.C. 2019) (quotation marks omitted). Thus, the Court finds that the class satisfies the commonality requirement of Rule 23(a)(2).

### c. Typicality

"Typicality requires that the claims of the representative be typical of those of the class," *Encinas v. J.J. Drywall Corp.*, 265 F.R.D. 3, 9 (D.D.C. 2010), and is generally satisfied "when the plaintiffs' claims arise from the same course of conduct, series or events, or legal theories of other class members," *In re XM Satellite Radio Holdings Secs. Litig.*, 237 F.R.D. 13, 18 (D.D.C. 2006). "The facts and claims of each class member do not have to be identical to support a finding of typicality; rather, [t]ypicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff." *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 52 (D.D.C. 2010) (quotation marks and citation omitted).

The claims of Randle, Taylor, Boyd, and Johnson are typical of the class. They, like the class as a whole, were employed by SunTrust as financial advisors during the relevant time and self-identified to SunTrust as Black or African American. They allege claims typical of the class, in that they assert they were harmed by the same discriminatory practices and policies as others in the class. *See* ECF No. 38 ¶¶ 34–48. Thus, their claims are typical of those that could be advanced by the class as a whole, and so the Court finds that the class satisfies the typicality requirement of Rule 23(a)(3).

### d. Adequacy

Rule 23(a)'s adequacy requirement demands that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). "Two criteria for determining the adequacy of representation are generally recognized: 1) the named representative must not

have antagonistic or conflicting interests with the unnamed members of the class, and 2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997).

The adequacy requirement is satisfied.  Nothing in the record suggests conflicting interests between the named and unnamed class members, and because "the named plaintiffs will receive an award in accordance with the same formula as the rest of the class, aside from their service awards for pursuing the claims for the class . . . the Court concludes that the named plaintiffs possess the same interest and suffer the same injury as the class members." *Kinard v. E. Capitol Fam. Rental, L.P.*, 331 F.R.D. 206, 214 (D.D.C. 2019) (internal quotation marks omitted) (quoting *Amchem*, 521 U.S. at 625–26); *see* EFC No. 56-1 at 44.  And the motion documents significant efforts by Randle, Taylor, Boyd, and Johnson to participate in the negotiation of this settlement and advocate on behalf of the class.  ECF No. 56 at 9.  Finally, Plaintiffs are represented by sophisticated counsel who attest they have "significant experience in civil cases relating to" the same subject matter as this case.  ECF No. 56 at 9 (quoting *Kinard v. E. Capitol Fam. Rental, L.P.*, 331 F.R.D. 206, 214 (D.D.C. 2019).  Thus, the Court finds that the named plaintiffs can vigorously pursue the interests of the class through qualified counsel, and thus the class satisfies the adequacy requirement of Rule 23(a)(4).

## 2.    Rule 23(b)

Having satisfied the Rule 23(a) requirements, Plaintiffs seek class certification under both (b)(2) and (b)(3), presumably relying on the former for the requested injunctive relief and the latter for monetary relief.  ECF No. 62 at 29–30.  Both are satisfied.

### a.    Rule 23(b)(2)

Certification under Rule 23(b)(2) is warranted when the party opposing the class "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful as to all of the class members or as to none of them." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) (citation omitted). That is, "a single injunction or declaratory judgment" must be able to "provide relief to each member of the class." *Id.*

Plaintiffs allege that every class member was subject to the same company-wide policies and practices that harmed African American financial advisors. And as part of this litigation, Plaintiffs have sought a class-wide injunction against those policies and practices, which would provide the same relief to all class members. *See* ECF No. 38 at 2. Notably, the proposed settlement provides that relief. It addresses Plaintiffs' allegations of company-wide discriminatory policies and practices and provides programmatic, injunctive relief for the collective class of African American financial advisors. For example, that relief will put in place mechanisms by which financial advisors may communicate their interest in working at particular branches and through which it will ensure that accounts of financial advisors that depart SunTrust are distributed consistent with company policy. ECF No. 56-1 at 31. This programmatic relief would apply to the class as a whole. Given that, the Court finds that the proposed class satisfied this requirement.

### b.    Rule 23(b)(3)

Finally, a Rule 23(b)(3) class action may be maintained if "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"The predominance inquiry implicates the commonality requirement of Rule 23(a)(2)" in that "the common issues identified as sufficient under Rule 23(a) must be shown by the plaintiffs to predominate over the non-common issues." *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 262 (D.D.C. 2002). "[I]n general, predominance is met 'when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position.'" *Id.* (citation omitted). As explained above, the named plaintiffs' claims are based on the same alleged policies and practices by Sun-Trust, and thus hinge on the same "generalized evidence" of such practices. *See Moore v. Napolitano*, 926 F. Supp. 2d 8, 33 (D.D.C. 2013). And to the extent there are difference of fact among the class members' individual claims, "the existence of a settlement that eliminates manageability problems can alter the outcome of the predominance analysis." *In re APA Assessment Fee Litig.*, 311 F.R.D. 8, 18 (D.D.C. 2015) (internal quotations omitted). Thus, the Court finds that the proposed class satisfies the predominance requirement.

Next, "[t]he superiority requirement ensures that resolution by class action will 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable consequences.'" *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 117 (D.D.C. 2007) (quoting *Amchem*, 521 U.S. at 615). Given that a settlement agreement has been negotiated, "a class action is clearly the superior method to adjudicate the claim." *Greenberg v. Colvin*, 63 F. Supp. 3d 37, 46 (D.D.C. 2014). "Any class member who wishes to prosecute his own claim may opt out of the Class," and "[b]ecause the class is certified only for settlement, the Court 'need not inquire whether the case, if tried, would present intractable management problems.'" *Id.* (quoting *Amchem*, 521 U.S. at 620). Thus, this requirement is satisfied.

*      *      *

For all the above reasons, the Court finds that the proposed class satisfies the requirements of Rules 23(a), (b)(2), and (b)(3), and with the consent of the parties, the Court will certify the class for settlement purposes.

## III.   Final Approval of Class Settlement

### A.   Legal Standard

Parties to a class action cannot enter into a binding settlement agreement without court approval.  Fed. R. Civ. P. 23(e); *see also Thomas*, 139 F.3d at 231.  A reviewing court may approve a proposed agreement "only after a hearing and only on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  In making that determination, courts in this District have followed a five-factor test, evaluating (1) whether the settlement results from arm's-length negotiations; (2) the terms of the settlement in relation to the strength of the plaintiffs' case; (3) the status of the litigation at the time of settlement; (4) the reaction of the class; and (5) the opinion of experienced counsel.  *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d 100, 104 (D.D.C. 2004).[1] When parties are "seeking class certification and settlement at the same time, however," the court must apply "'closer judicial scrutiny' than settlements that are reached after class certification." *Trombley v. Nat'l City Bank*, 759 F. Supp. 2d 20, 23 (D.D.C. 2011) ("*Trombley I*") (quoting Manual for Complex Litigation (Fourth) § 21.612 (2004)).

---

[1] Under the federal rules, a court must consider whether: (1) "the class representatives and class counsel have adequately represented the class"; (2) "the proposal was negotiated at arm's length"; (3) "the relief provided for the class is adequate, taking into account," as relevant here, the costs, risks, and delay of trial and appeal, the effectiveness of the proposed method of distributing relief to the class, and the proposed attorney's fee awards; and (4) "the proposal treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e).  In its analysis of the *Vitamins* factors below, the Court also considers any of these factors not otherwise encapsulated by that test.

Whether to approve a proposed settlement agreement is ultimately within the discretion of the reviewing court. *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 375 (D.D.C. 2002). But that discretion "is constrained by the 'principle of preference' favoring and encouraging settlement in appropriate cases." *In re Vitamins Antitrust Litig.*, 305 F. Supp. at 103 (quoting *Pigford v. Glickman*, 185 F.R.D. 82, 103 (D.D.C. 1999)). Indeed, in this Circuit, "[s]ettlement is highly favored, as '[n]ot only the parties, but the general public as well, benefit from the saving of time and money that results from the voluntary settlement of litigation.'" *United States v. MTU Am. Inc.*, 105 F. Supp. 3d 60, 63 (D.D.C. 2015) (second alteration in original) (quoting *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983)).

## B.  Analysis

The Court now turns to the terms of the proposed settlement agreement, which as set forth above, the Court must find are "fair, adequate, and reasonable." Fed. R. Civ. P. 23(e). In doing so, the Court looks to the five factors considered by courts in this Circuit when making such a determination. *See In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d at 104.

### 1.  Arm's-Length Negotiations

A "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery." *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d at 104. "[F]ormal discovery is not . . . necessarily required even for final approval of a proposed settlement" if the parties "demonstrate to the Court at the final approval stage their sufficient appreciation for the merits of the case and [are] able to explain in greater detail the 'significant factual investigation' made prior to the settlement." *Trombley I*, 759 F. Supp. 2d at 26 (D.D.C. 2011) (quoting *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d at 105).

Here, both parties were represented by experienced counsel.  *See* ECF No. 62-5 at 4–10; Feb. 1, 2024 Hr'g Tr. at 20:15–21:5.  And the parties represent that they engaged in arm's-length negotiations "over the course of more than two years, including four days of formal mediation sessions, multiple additional sessions" with a "nationally well-known and experienced mediator," and "conferences among counsel."  ECF No. 63 at 8–9; *see also* ECF No. 62 at 16–17; Feb. 1, 2024 Hr'g Tr. at 21:6–21.  During that time, they made "lengthy presentations of their factual and legal arguments" along with "expert data analysis" and "theories of damages."  ECF No. 63 at 9. Their negotiations were "protracted and contentious" and, often, seemed to be at an impasse, before ultimately resulting in the proposed settlement agreement.  ECF No. 62-5 at 13–14.  In light of these representations, the Court easily concludes that the settlement resulted from fair, arm's-length negotiations between experienced counsel, and this factor supports approving the settlement agreement.

### 2.        Terms of the Settlement in Relation to the Strength of the Case

Under this factor, courts typically "compare[] the terms of the settlement with the likely recovery plaintiffs would attain if the case proceeded to trial, an exercise which necessarily involves evaluating the strengths and weaknesses of plaintiffs' case." *Stephens v. U.S. Airways Grp., Inc.*, 102 F. Supp. 3d 222, 227 (D.D.C. 2015) (quoting *In re Fed. Nat'l Mortg. Ass'n Secs., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d 94, 103 (D.D.C. 2013)).  That is, because "liability cannot be assumed when evaluating a proposed settlement . . . [t]he value of the settlement must be balanced against the likelihood of obtaining a substantial recovery at trial." *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 58–59 (D.D.C. 2010).  "The D.C. Circuit has suggested that this may be the most important factor in evaluating a proposed class settlement." *Ceccone*, 2016 WL 5107202, at *9 (citing *Thomas*, 139 F.3d at 231).

Along with expansive programmatic relief, the proposed settlement agreement provides for a fund of $14 million which, if approved, would rank among the largest employment discrimination class funds in the last few years. *See* ECF No. 62 at 20. Even the minimum award to each class members—$25,000—would be among the highest per capita awards in an employment discrimination class action settlement in recent years. *Id.* True, the settlement will not be distributed equally among the class. But the apportionment of relief among the class based on an individualized assessment of class members' claims still treats class members "equitably relative to each other." Rule 23(e)(2)(D); *see In re Vitamins Antitrust Litig.*, No. 99-mc-197 (TFH), 2000 WL 1737867, at *6 (D.D.C. Mar. 31, 2000) ("Settlement distributions, such as this one, that apportions funds according to the relative amount of damages suffered by class members have repeatedly been deemed fair and reasonable.").

Should the case proceed, rather than settle, the parties represent that SunTrust would oppose class certification and attempt to disaggregate Plaintiffs' claims, meaning, each Plaintiff would need to prevail on the merits and prove damages. ECF No. 62 at 19. While Plaintiffs "believe[] [they] would ultimately prevail," they also recognize that "'claims alleging systemic employment discrimination are difficult to win.'" *Id.* (citation omitted). Thus, weighing the risks and costs to both parties should they continue to litigate this case, as well as the extensive programmatic and monetary relief laid out in the settlement agreement designed to remedy Plaintiffs' claims, the Court finds that the terms of the proposed settlement appear fair, adequate, and reasonable given those considerations.

### 3.    Stage of the Proceedings

Next, courts look to "whether counsel had sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-à-vis the probability of success and range of recovery." *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 565 F. Supp. 2d 49, 57 (D.D.C. 2008)

(quoting *In re Lorazepam & Clorazepate Antitrust Litig.*, No. 99-cv-790 (TFH), 2003 WL 22037741, at *4 (D.D.C. June 16, 2003)).  In doing so, courts may weigh favorably settlements that do not "come too early to be suspicious nor too late to be a waste of resources," but "at a desirable point in the litigation for the parties to reach an agreement and to resolve these issues without further delay, expense, and litigation." *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d at 105.

This case was filed more than five years ago, and the parties' proposed settlement stemmed from more than two years of mediation and other negotiations, after the Court denied SunTrust's motion to dismiss and granted the parties a stay to exchange discovery and engage in those negotiations.  The parties represent that there was a "substantial exchange of key information necessary to fully evaluate the claims and potential damages," and class counsel "retain[ed] an expert labor economist and statistician to review and analyze the workforce and account data and conduct extensive studies and analyses regarding issues of liability and damages, which informed Plaintiffs' mediation positions and negotiations."  ECF No. 62 at 24–25.  Thus, the parties have had sufficient time and information to assess the value of the settlement over the risks of continued litigation, and it does not come too late, after much further class certification or merits briefing, so as to be a waste of resources.

### 4.      Reaction of the Class

The next factor generally considered in determining the reasonableness of a settlement is the reaction of the class.  *Thomas*, 139 F.3d at 231–33; *In re Nat'l Student Marketing Litig.*, 68 F.R.D. at 155.  The four class representatives "fully endorse" the settlement.  ECF No. 62 at 25. And in addition, 33 notices of the Court's preliminary approval of the settlement were sent to class members, and all class members are believed to have received such notice by mail.  ECF No. 62-

3 at 3.  No timely objections or exclusion requests were received by the parties or the Court.[2]  *Id.* at 4.  With no opposition to the settlement from class members, the Court finds that "[t]his factor therefore unambiguously weighs in favor of approval."  *Alvarez v. Keystone Plus Constr. Corp.*, 303 F.R.D. 152, 164 (D.D.C. 2014).

## 5. Opinion of Experienced Counsel

The opinion of experienced counsel "should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement."  *Chilcott*, 522 F. Supp. 2d at 121. Counsel for both parties are experienced in litigating class action discrimination suits, and have represented that, in their opinion, the settlement is fair, adequate, and reasonable.  ECF No. 62 at 17 ("Based on their experience and an in-depth analysis of the merits, the record, and the risks of this action, Class Counsel enthusiastically recommend this Settlement to the Court); Feb. 1, 2024 Hr'g Tr. at 20:15–21:21.  So though the Court will not adhere "blindly to the views of counsel," it does credit the opinions of experienced counsel, and concludes that this factor, too, supports approving the settlement agreement.  *See In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d at 106.

*        *        *

---

[2] In fact, the opposite happened: one non-class member attempted to opt *in* to the agreement.  The day before the fairness hearing, a SunTrust employee moved to intervene, arguing he was a member of the settlement class.  ECF No. 64.  But the parties who struck the agreement argued otherwise, because the employee had not self-identified as African American and/or Black in SunTrust's workforce data that was used to develop the class list.  ECF Nos. 65, 66.  The Court agreed.  ECF No. 69.  And this employee's exclusion from the settlement class does not cast doubt on whether the Court should approve the settlement.  As explained, the parties have negotiated a fair, adequate, and reasonable settlement on behalf of a defined class of plaintiffs.  And non-class members are no worse off for it—they retain all their rights, including the ability to sue SunTrust for racial discrimination.

Thus, for the reasons explained above, the Court finds that the proposed settlement agreement satisfies the requirements of Rule 23(e)(2) and will grant the motion to approve the settlement.

## IV. Service Awards and Attorney's Fees and Costs

### A. Legal Standards

First, "[i]t is common for courts to approve incentive awards in class-action litigations, especially when there is a common fund created to benefit the entire class." *Little v. Washington Metro. Area Transit Auth.*, 313 F. Supp. 3d 27, 35 (D.D.C. 2018). Indeed, courts in this Circuit regularly approve service awards "to compensate plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Radosti v. Envision EMI, LLC*, 760 F. Supp. 2d 73, 79 (D.D.C. 2011). In making that determination, courts may consider (1) "the actions the plaintiff has taken to protect the interests of the class," (2) "the degree to which the class has benefitted from those actions;" and (3) "the amount of time and effort the plaintiff expended in pursuing the litigation." *Wells v. Allstate Ins. Co.*, 557 F. Supp. 2d 1, 8–9 (D.D.C. 2008) (citation omitted). Besides compensating named plaintiffs for "work done on behalf of the class," incentive awards are also intended "to make up for financial or reputational risk undertaken in bringing the action," among other considerations. *Cobell v. Jewell*, 29 F. Supp. 3d 18, 25 (D.D.C. 2014), *aff'd in part and vacated in part on other grounds*, 802 F.3d 12 (D.C. Cir. 2015).

Next, under Federal Rule of Civil Procedure 23(h), "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." And "a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also Hartman v. Pompeo*, No. 77-cv-2019, 2020 WL 6445873, at *6 (D.D.C. Nov. 3, 2020) ("[F]air and just allowances for expenses

and counsel fees should be spread among all the beneficiaries of the fund." (internal quotations omitted)).  Courts in this District often consider "(1) the size of the fund created and the number of persons benefited, (2) the presence or absence of substantial objections by class members to the settlement terms or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of litigation, (5) the risk of nonpayment, (6) the time devoted to the case by plaintiffs' counsel, and (7) awards in similar cases." *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d 94, 110–11 (D.D.C. 2013).

As for costs, "[c]ounsel are entitled to reimbursement only for those expenses incurred in the course of work that benefitted the class." *In re Vitamins Antitrust Litig.*, No. 99-mc-197 (TFH), 2001 WL 34312839, at *13 (D.D.C. July 16, 2001) (citation omitted).  "Attorneys are clearly not entitled to reimbursement of expenses where the request is for an amount which is excessive or otherwise non compensable." *Id.* (citation omitted).  But courts do "routinely award[] expenses for which counsel would normally directly bill their clients." *Id.*

### B.    Analysis

Plaintiffs request approval of service awards of $175,000 per class representative, as well as an award of attorney's fees amounting to of 25% of the settlement fund, or $3.5 million dollars, plus reasonable costs, for Plaintiffs' counsel.  ECF No. 63 at 6.  The Court takes each request in turn.

First, the Court will approve the parties' proposed service awards.  As counsel emphasize throughout their briefing, Randle, Taylor, Boyd, and Johnson have "invested hundreds of hours apiece over many years into prosecuting and settling this case."  ECF No. 63 at 11.  They met regularly with counsel, furnished documents and narrative input, and were part of all strategic decisions.  *Id.* at 11–13.  They participated in all four mediation sessions, spanning a two-year period, and regularly spoke with class members to keep them updated on the status of the litigation.

*Id.* at 13–14.  That time devoted to pursuing this litigation cost class representatives "hundreds of hours of lost business" and other opportunities, and, as financial advisors suing their current or former employer, they "placed their careers in jeopardy."  *Id.* at 15; *see generally Castillo v. Noodles & Co.*, 16-cv-3036, 2016 WL 7451626, at *2 (N.D. Ill. Dec. 23, 2016) (explaining that the need for service awards "to induce an individual to participate in the suit . . . is especially true in employment litigation" (quotation marks and citation omitted)).  Named plaintiffs also signed a general release of all claims, not just of their class claims.  *See Velez v. Novartis Pharm. Corp.*, No. 4-cv-9194, 2010 WL 4877852, at *26 (S.D.N.Y. Nov. 30, 2010) (granting enhanced service awards because named plaintiffs released additional claims).  Given these risks and the relative size of the settlement fund—here, $14 million—an award of $175,000 is within the approximate range approved by other courts.[3]  Neither SunTrust nor any class member has objected to these fees.  Thus, given the considerable cost and risk incurred by named plaintiffs for their significant time and effort expended, the Court will approve the service awards as fair and reasonable.

Next, the Court considers the parties' proposed award of attorney's fees and costs.  "[I]n class action cases in which the plaintiff class recovers benefits from a common fund, the favored method of calculating attorneys' fees is to award a percentage of the fund."  *Radosti v. Envision EMI, LLC*, 760 F. Supp. 2d 73, 77 (D.D.C. 2011).   The requested 25% of the settlement agreement—though large in absolute terms, given the overall size of the settlement fund here—is well

---

[3] *See, e.g.*, *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 5-cv-6583, Dkt. 616 at 5 (N.D. Ill. Dec. 6, 2013) (approving $250,000 service awards); *Chen-Oster v. Goldman Sachs & Co.,* No. 10-cv-6950 (AT), 2023 WL 7325264, at *3 (S.D.N.Y. Nov. 7, 2023) (approving $250,000); *Slaughter v. Wells Fargo Advisors, LLC*, No. 13-cv-6368 (HDL), Dkt. 113 at 5 (N.D. Ill. May 4, 2017) (approving $175,000); *Senegal v. JPMorgan Chase Bank, N.A.*, No. 18-cv-6006, Dkt. 40 at 5 (N.D. Ill. Dec. 20, 2018), *aff'd*, 939 F.3d 878 (7th Cir. 2019) (approving $150,000); *Bland v. Edward D. Jones & Co.*, No. 18-cv-3673, Dkt. 139 at 5 (N.D. Ill. July 1, 2021) (approving $150,000).

within the range of "reasonable" attorney's fees recognized in this Circuit, which generally runs

from "twenty to thirty percent of the common fund." *In re Lorazepam*, 2003 WL 22037741, at *7.

Of course, "[l]arger common funds are typically associated with smaller percentage awards . . .

because even a small percentage of a very large fund yields 'a very large fee award.'" *In re Fed.*

*Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d at 111 (quoting *In re Black*

*Farmers Discrim. Litig.*, 856 F. Supp. 2d 1, 39 (D.D.C. 2011)).  In "megafund" cases with funds

of "many millions or even billions of dollars," "an appropriate fee may be considerably less than

twenty percent of the fund."  *Id.* (citation omitted) (citing study of settlements involving funds of

over $100 million in which the mean attorney's fee award was about 18%).  But this is not such a

case.  Plaintiffs' counsel details the complexity and significant time and resources devoted to this

litigation warranting significant fees.  ECF No. 63 at 24–29.  And the requested fees are in the

range of others awarded in similar cases.[4]  Again, neither SunTrust nor any class member has

objected to the proposed attorneys' fees.  For these reasons, the Court approves the fee request.

Finally, the Court turns to the request for reasonable costs, amounting to $91,232.21.  ECF

No. 63 at 31.  About 20% are the costs of retaining an expert labor economist to analyze issues of

liability and damages, 45% are mediation costs, and the remainder relate to litigation expenses

such as travel and computerized research, all of which are regularly reimbursed, and the Court

finds they are compensable and not excessive.  *See In re Fed. Nat'l Mortg. Ass'n Sec., Derivative,*

*& "ERISA" Litig.*, 4 F. Supp. 3d 94, 113 (D.D.C. 2013) (reimbursing class counsel over $10

---

[4] *See, e.g.*, *Little*, 313 F. Supp. at 38–39 (awarding 25% of $6.5 million fund in attorney's fees and costs in employment discrimination class action); *Meyer v. Panera Bread Co.*, No. 17-cv-2565 (EGS/GMH), 2019 WL 11271381, at *9–10 (D.D.C. Mar. 6, 2019) (awarding 33.48% of almost $2 million fund in attorney's fees), *report and recommendation adopted sub nom. Meyer v. Panera, LLC*, No. 17-cv-2565 (EGS/GMH), 2019 WL 11271378 (D.D.C. Mar. 29, 2019); *Bynum v. District of Columbia*, 412 F. Supp. 2d 73, 81, 84–86 (D.D.C. 2006) (awarding $33% of $12 million fund in attorney's fees).

million in expert costs); *Howard v. Liquidity Serv. Inc.*, No. 14-cv-1183 (BAH), 2018 WL 4853898, at *8 (D.D.C. Oct. 5, 2018) (reimbursing class counsel for requested costs, "including costs for travel, consulting experts, and conducting mediation, as well as for costs related to deposition transcripts and computerized research").  For these reasons, the Court also approves the costs request.

## V.    Conclusion

For all the above reasons, the Court will grant the parties' motions for class certification, final approval of the class action settlement, service awards to class representatives, and attorney's fees and costs.  ECF Nos. 62, 63.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: February 21, 2024